390 S.E.2d 562

**LIBERTY MUTUAL INSURANCE COMPANY**

v.

**TRIANGLE INDUSTRIES, INC., and Triangle PWC, Inc.**

v.

**WAUSAU INSURANCE COMPANIES and Employers Insurance of Wausau; New Jersey Property–Liability Guaranty Association, on Behalf of Ideal Mutual Insurance Company, in Liquidation, and Zurich–American Insurance Company, Severally and in the Alternative.**

**No. CC999.**

Supreme Court of Appeals of West Virginia.

Feb. 21, 1990.

James P. Whitters, III, Martha J. Koster, Lee H. Glickenhaus, Gaston & Snow, Boston, Mass., James F. Companion, Frederick P. Stamp, Jr., Patrick S. Casey, Schrader, Stamp, Byrd, Byrum & Companion, Wheeling, for Liberty Mut. Ins. Co.

Michael E. Runyon, Washington, D.C., John Skaggs, Charleston, for New Jersey Property.

J. Greg Goodykoontz, Steptoe & Johnson, Clarksburg, Stephen M. Orlofsky, Carlo Scarmella, Blank, Rome, Comisky & McCauley, Cherry Hill, N.Y., for Triangle Industries, Inc.

Anthony R. Zelle, Wm. Gerald McElroy, Jr., Zelle & Larson, Waltham, Mass., Patrick S. Cassidy, O'Brien, Cassidy & Gallagher, Wheeling, for Wausau Ins. Co.

William A. Trainer, J. Michael Weber, Parkersburg, Robert J. Bates, Jr., Phelan, Pope & John, Ltd., Chicago, Ill., for Zurich–American Ins. Co.

BROTHERTON, Justice:

This case involves two questions certified to this Court from the United States District Court for the Northern District of West Virginia. The district court asks that we answer the following:

1. Does West Virginia's substantive law apply to the interpretation of the insurance policies at issue?

2. If so, do the insurance policies at issue give rise to a duty to defend and indemnify the insured by the respective insurers?

I.

Triangle Industries (alternately known as Trian Holdings, Inc. and Triangle PWC, hereinafter referred to as Triangle) is a company that was headquartered in New Jersey at the time the insurance coverage at issue was sought. Triangle owned and operated a processing plant in Glen Dale, West Virginia. The Glen Dale plant was engaged in the business of steel "pickling" which generated a waste product known as "lime stabilized waste pickle liquor sludge" (sludge).

Between November, 1977, and October, 1980, the sludge was shipped for disposal to the Buckeye Landfill outside St. Clairsville, Ohio. Triangle engaged the services of an independent contractor to transport the sludge to the landfill.

On October 15, 1980, the Ohio EPA conducted sampling of the sludge located at the Buckeye Landfill site and determined that the sludge was "toxic." In December, 1980, the Ohio EPA conducted further samplings of surface water from a stream near the Buckeye Landfill. The water analysis indicated that contaminated materials were escaping from the landfill.

On September 8, 1983, the Buckeye Landfill was listed on the National Priorities List pursuant to § 105 (8) (B) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.A. § 9601 et seq. (West 1983) (CERCLA). Based upon tests conducted at the site, the Ohio EPA and the Federal EPA concluded that the Buckeye Landfill had been releasing and was continuing to release hazardous substances which posed an imminent and substantial danger to the public health, welfare, and the environment.

On December 7, 1984, Triangle was notified by the Federal EPA that it was being designated a "potentially responsible party" pursuant to CERCLA, in connection with the environmental contamination at the landfill.

On March 7, 1985, Triangle's counsel placed all of Trian and PWC's insurance carriers on notice of the claims asserted by the Federal EPA arising out of the enforcement actions at the Buckeye Landfill. In response, the plaintiff, Liberty Mutual, acknowledged its duty to defend Triangle. In a February 27, 1986, letter from James M. Shaw, Examiner, Special Claims Division, Liberty Mutual Insurance Company, Mr. Shaw stated, "We do, however, agree to participate in the defense of Triangle with other insurers that owe a duty to defend."

On October 3, 1985, Triangle, along with other potentially responsible parties, executed an administrative order, known as a consent decree, as required by the Federal and Ohio EPA, for the cleanup of the landfill.[1]

By letter dated February 1, 1988, Donald Nelson, Technical Claims Specialist at Liberty Mutual Insurance Company, denied coverage under each of Liberty Mutual's insurance policies and declared that Liberty Mutual would not provide indemnification for this claim and would not pay for defense costs beyond February 1, 1988.[2]

By letter dated March 25, 1988, defense counsel wrote to Liberty Mutual to clarify Triangle's position regarding the insurance coverage. In this letter, counsel for Triangle stated that coverage should be afforded under the comprehensive general liability policy (CGL) because there had been an "occurrence," as defined by the policy, during the policy period.[3]

---

1. The Buckeye Landfill, also known as the Belmont County Landfill, is located in Ohio on approximately 50 acres of a 650–acre tract of land owned by the Ohio Resources Corporation. The property is located approximately four miles southeast of St. Clairsville, Ohio. The landfill has been in operation since 1971.

2. In its brief, Liberty Mutual defends its actions in initially defending the claim by pointing out that it had a duty to investigate the claim to determine whether they did owe a duty to defend. Liberty Mutual denied coverage once they determined they no longer had a duty to defend.

3. The CGL policy contained standard policy language, which provided that:
   The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
      Coverage A: Bodily injury or
      Coverage B: Property damage,

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment or judgment or settlement.
   The policy also contains a pollution liability exclusion at subsection (f). It provides that this policy does not apply:
      to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but

Finally, Triangle advised Liberty Mutual that if it continued to decline coverage, Triangle would initiate a declaratory judgment action. However, three weeks later, Liberty Mutual filed suit in United States District Court for the Northern District of West Virginia requesting a declaratory judgment, stating that it owed no duty to defend or indemnify Triangle.

On June 20, 1988, the defendants filed a third party complaint against third party defendants, Wausau Insurance Companies, Zurich American Insurance Company, and New Jersey Property Liability Insurance Guarantee Association on behalf of Ideal Mutual Insurance Company, in liquidation (NJPLIGA), who also held CGL and other insurance policies for the defendants.[4]

On January 17, 1989, the plaintiff, Liberty Mutual, filed a motion for summary judgment against the defendants. On March 1, 1989, the defendants filed a cross motion for summary judgment. Similar motions were filed by the other third party defendants. By order dated July 5, 1989, the United States District Court for the Northern District of West Virginia certified the two questions listed above to this Court.

## II.

■■■ The first certified question asks that we determine whether West Virginia substantive law applies to the interpretation of the insurance policies at issue in this case. We must first identify the type of issue involved in order to determine what conflict of law rule to apply.[5] This Court has held that the interpretation of insurance policy coverage, rather than liability, is treated as a contract question for purposes of conflicts analysis. *Lee v. Saliga,* 179 W.Va. 762, 373 S.E.2d 345, 350 (1988). As the issue presented in the case before us involves a question of the interpretation of the terms of an insurance policy, we must therefore focus our analysis on the conflicts of law rule applicable to a contract issue.

West Virginia law has not yet dealt with the precise issue of the applicable choice of law when an insurance policy is executed in one state for coverage in another state, and damage takes place in a third. The general issue of choice of law was examined in *General Electric Co. v. Keyser,* 166 W.Va. 456, 275 S.E.2d 289 (1981), in which this Court invalidated a choice of law provision contained in a contract after examining § 187(2) of the *Restatement (2d) of Conflict of Laws (Restatement).* At syllabus point 2, the Court concluded that:

> "The law of the state in which a contract is made and to be performed governs the construction of a contract when it is involved in litigation in the courts of this state." Syl. pt. 1 (in part) *Michigan Na-*

---

this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Liberty Mutual supplied Triangle with a pollution liability policy (PLP), with an effective or "retroactive" date of July 1, 1982. The policy was renewed to run for an additional year from July 1, 1983, to July 1, 1984. The policy appears to have been cancelled in May, 1984. The PLP provides that

> The company [Liberty Mutual] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as compensatory damages because of bodily injury or property damage to which this insurance applies, provided that: (1) such bodily injury or property damage is caused by a pollution incident which commences subsequent to the retroactive date shown in the declaration of this policy, and (2) the claim for such damages is first made against the

insured during the policy period and reported to the company during the policy period or within fifteen days after its termination.

4. The defendant contends that it is entitled to coverage under eleven separate policies of insurance, running collectively from January 1, 1977, to April 1, 1987.

| | |
|---|---|
| 1/1/77—1/1/81 | Wausau Insurance Co. |
| 1/1/81—1/1/82 | Ideal Mutual (in liquidation—NJPLIGA) |
| 1/1/82—1/1/84 | Liberty Mutual |
| 1/1/84—4/1/87 | Zurich Insurance Co. |

5. In *Paul v. National Life,* 177 W.Va. 427, 352 S.E.2d 550 (1986), this Court upheld the *lex loci delicti* theory of conflicts of law when a tort is involved. In *Paul,* the Court found that *"[l]ex loci delicti* has long been the cornerstone of our conflict of laws doctrine. The consistency, predictability, and ease of application provided by the traditional doctrine are not to be discarded

*tional Bank v. Mattingly*, [158] W.Va. [621], 212 S.E.2d 754 (1975).

More recently, in *Lee v. Saliga*, 179 W.Va. 762, 373 S.E.2d 345 (1988), this Court examined insurance contracts under a conflicts of law analysis. *Saliga* involved a question of coverage under an uninsured motorist policy issued in Pennsylvania, where the accident in question occurred in West Virginia. Under West Virginia law, a requirement of physical contact is directly incorporated into the uninsured motorist statute. By contrast, Pennsylvania did not require physical contact under its uninsured motorist act, as the physical contact requirement was held void as contrary to public policy.

After reviewing the West Virginia choice of law cases and the *Restatement*, Justice Miller determined that:

> Our traditional contract conflict rule gives substantial deference to the state where the contract is made and where it is to be performed, assuming both incidents occur in the same state. This rule is subject to two qualifications: (1) that the parties have not made a choice of applicable law in the contract itself; and (2) the law of the other state does not offend our public policy.

*Id.* 179 W.Va. at 768, 373 S.E.2d at 351. Applying that rule to the facts in *Saliga,* the Court determined that "[t]he provisions of a motor vehicle liability policy will ordinarily be construed according to the laws of the state where the policy was issued and the risk insured was principally located, unless another state has a more signifi-

cant relationship to the transaction and the parties." *Id.* 179 W.Va. at 770, 373 S.E.2d at 353.

Both cases, however, fail to contemplate a situation in which the contract is made in one state to be performed in another state.[6] In the case now before us, we find that the policy was issued in New Jersey, while the insured risk was located in West Virginia and the damage occurred in Ohio. Further, as Triangle points out, the insurance policies insured risks in numerous other locations besides the Glen Dale, West Virginia, site. Obviously, these facts differ sufficiently from previous case law so as to require an independent analysis under the *Restatement.*

Section 193 of the *Restatement* concerns what law to apply when the "validity of a contract of fire, surety or casualty insurance and the rights created thereby" are questioned. Specifically, Section 193 provides that the validity of such a contract is determined:

> by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Commentary B to the *Restatement* explains the language of § 193, noting that normally, the policy will be solicited, delivered, and executed in the same state where the insured is domiciled and the insured risk located. In the present case, however,

---

lightly...." *Id.* 177 W.Va. at 433, 352 S.E.2d at 555.

**6.** This Court addressed a similar situation in *New v. Tac & C Energy, Inc.,* 177 W.Va. 648, 355 S.E.2d 629 (1987), which involved an employment contract for a company based in West Virginia concerning its mine site in Kentucky. A review of § 196 of the *Restatement* revealed that when a contract to render services was involved, the *Restatement* gives preference to the law of the state where the services are to be performed, subject to the contracting parties' choice of law and the theory that the preference for the law of the place of rendition of the services can be altered to a state that has a more significant relationship to the parties and the transaction. *Id.* 177 W.Va. at 650, 355 S.E.2d at

631. The Court found that since West Virginia had more substantial contact with the transaction, its law should apply. *Id.*

We believe the reasoning in *Tac & C Energy* is unique to that particular situation. The *Restatement'*s preference for the place of rendition of the services can be distinguished from the instant case by the nature of the contract in question. An employment contract centers around the specific services which are to be performed at a place of business. Absent a state with a more significant connection, the state where the services are to be performed is the most likely candidate to govern that contract. That reasoning does not exist in the present situation involving insurance policy interpretation, and thus, does not govern our choice of law analysis.

not only are there multiple states identified where the risks insured under the policy are located, but the place of contract and the place of the insured risk are different. Thus, we turn to § 6 of the *Restatement* for guidance.

Section 6 of the *Restatement* sets forth the following factors to consider, specifically providing that:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

After reviewing the factors found in § 6 of the *Restatement*, we are of the opinion that the law of the state of the contract should apply. We believe that "certainty, predictability and uniformity of result," as well as "ease in the determination and application of the law to be applied" is essential to the interpretation of an insurance policy when the law is not otherwise chosen by the parties. Given the increasingly complex nature of the insurance industry, we believe that the needs of the "interstate" system of insurance require that law be applied in the most uniform and predictable manner possible.[7] Although we recognize that, in this case, both West Virginia and Ohio have significant relationships to the transaction, the policy was bargained for, created, and agreed to in New Jersey by both parties. We do not believe the insurance company demonstrated any reasonable expectation at the time the contracts were entered into that any litigation over the policy would be based upon West Virginia law.

Quite simply, we believe that, absent specific provisions to the contrary, it is infinitely more practicable to permit one policy to cover the numerous contracts rather than to require both Triangle and the insurance companies to negotiate individual policies based upon each state where an insured risk is located.[8] When carefully weighed, we conclude that the factors tilt in favor of the law of the place of contract.

Consequently, in a case involving the interpretation of an insurance policy, made in one state to be performed in another, the law of the state of the formation of the contract shall govern, unless another state has a more significant relationship to the transaction and the parties, or the law of the other state is contrary to the public policy of this state.[9]

Because the first certified question has been answered in the negative, the second certified question shall not be addressed. The case is remanded to the Federal District Court for the Northern District of West Virginia.

Certified question answered; case remanded.

**7.** *See generally,* Note, *The Applicability of General Liability Insurance to Hazardous Waste Disposal,* 57 S.Cal.L.Rev. 745 (1984); Tyler & Wilcox, *Pollution Exclusion Clauses: Problems in Interpretation and Application Under the Comprehensive General Liability Policy,* 17 Idaho L.Rev. 497 (1981).

**8.** *See Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.,* 674 F.Supp. 354, 356–57

(D.D.C.1987), in which the district court held that the state in which negotiation and formation occurred has the most substantial interest in seeing its laws applied to the conduct of the parties negotiating for insurance in its jurisdiction.

**9.** *See Paul v. National Life,* 177 W.Va. 427, 352 S.E.2d 550, 556 (1986).