424 S.E.2d 256

188 W.Va. 329

**Roger NADLER, Executor of the Estate of James A. Schoettker and Administrator of the Estate of Sara R. Schoettker; Sylvia B. Schoettker, Individually, and as Mother and Natural Guardian of Robert Maxwell Schoettker, Kathleen Suzette Schoettker, Matthew Alan Schoettker, Allyson Marie Schoettker, and Tiffany Noelle Schoettker, Plaintiffs,**

v.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant.**

No. 21004.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 16, 1992.

Decided Nov. 13, 1992.

Monty L. Preiser, Preiser, Tabor, Lindsay & Coltelli, Charleston, for plaintiffs.

J. Peter Richardson, Richardson, Kemper, Hancock & Davis, Bluefield, for defendant.

MILLER, Justice:

This case involves a question certified to us by the United States Court of Appeals for the Fourth Circuit pursuant to W.Va. Code, 51–1A–1, *et seq.*[1] We are asked to decide whether the substantive law of Ohio or the substantive law of West Virginia is to be applied to determine the rights of the parties under a contract for underinsured motorist coverage.

### I.

This dispute arose out of an automobile accident which occurred on March 27, 1988, on U.S. Route 60 in Greenbrier County when a tractor-trailer owned by Benjamin Thomas, Sr., d/b/a Thomas Trucking Company, and operated by Benjamin Thomas, Jr., crossed the center line and collided with a vehicle owned and operated by James A. Schoettker of West Chester,

---

1. W.Va.Code, 51–1A–1, provides:

   "The supreme court of appeals of West Virginia may answer questions of law certified to it by the Supreme Court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of any other state, when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of appeals of this State."

Ohio. Mr. Schoettker's wife, Sylvia, and their six children were passengers in the Schoettker vehicle at the time of the accident. Mr. Schoettker and his daughter, Sara, were killed. Mrs. Schoettker and the other children suffered serious bodily injury. In addition, Mrs. Schoettker lost an unborn child as a result of the accident.

Both vehicles were insured by Liberty Mutual Fire Insurance Company (Liberty Mutual). The Thomas policy, which was issued in West Virginia, provided liability insurance with a single accident limit of $325,000. This amount was paid to the plaintiffs.[2]

The Schoettker policy was issued in Ohio, where the plaintiffs lived and where the vehicle was registered. The policy provided underinsured motorist coverage on two vehicles, including the vehicle involved in the accident, in the amount of $300,000. The policy also contained provisions, however, which expressly denied coverage when the amount of liability insurance available from another source was equal to or greater than the amount of underinsured motorist coverage available under the policy and provided for a set-off for any liability insurance received by the insured.[3]

When the plaintiffs attempted to recover underinsured motorist benefits under the Schoettker policy, Liberty Mutual denied coverage. The plaintiffs subsequently brought a declaratory judgment action in the United States District Court for the Southern District of West Virginia to adjudicate the parties' rights and responsibilities under the contract of insurance. The complaint alleged that the plaintiffs were entitled to underinsured motorist benefits under the policy in reliance on West Virginia law. Liberty Mutual responded that the plaintiffs were not entitled to benefits because the amount of the liability insurance paid under the Thomas policy exceeded the per accident limitation of the underinsured motorist coverage under the Schoettker policy in reliance on Ohio law. The parties agreed that there were no material issues of fact and submitted the case for decision on cross-motions for summary judgment.

The District Court determined that the substantive law of Ohio, rather than the law of West Virginia, governs the interpretation of the insurance policy and granted Liberty Mutual's motion for summary judgment. *See Nadler v. Liberty Mut. Fire Ins. Co.*, 770 F.Supp. 294 (S.D.W.Va.1990). The plaintiffs' motion to alter judgment was denied, and the plaintiffs appealed to the Court of Appeals for the Fourth Circuit. By order dated February 25, 1992, the Court of Appeals certified to this Court the question of whether the application of Ohio law to interpret the terms of the Schoettker insurance policy violates the public policy of this State.

## II.

The parties agree that under Ohio law, the plaintiffs are not entitled to recov-

---

2. The plaintiffs are Mrs. Schoettker, individually and as the representative of her five surviving children, and Roger Nadler, personal representative of the estates of James Schoettker and Sara Schoettker.

3. The insurance contract states; in pertinent part:

"INSURING AGREEMENT

\* \* \* \* \* \*

"C. 'Uninsured motor vehicle' means a land motor vehicle or trailer of any type:

\* \* \* \* \* \*

2. To which a bodily injury liability bond or policy applies at the time of the accident. In this case its limit for bodily injury liability must be less than the limit of liability for this coverage.

\* \* \* \* \* \*

"LIMIT OF LIABILITY

"A. The Limit of Liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one accident. This is the most we will pay regardless of the number of:

  1. **Insureds;**
  2. Claims made;
  3. Vehicles or premiums shown in the Declarations; or
  4. Vehicles involved in the accident.

\* \* \* \* \* \*

"With respect to coverage under Section 2. of the definition of uninsured motor vehicle, the limit of liability shall be reduced by all sums paid because of bodily injury by or on behalf of persons or organizations who may be legally responsible...."

Although the policy refers only to "uninsured" motorists and vehicles, it is clear from the provisions discussed above that the policy provides underinsured motorist coverage as well.

er any underinsured motorist benefits under the Schoettker policy. By statute, Ohio requires insurers to offer optional underinsured motorist coverage, but specifies the limits of the insurer's liability therefor as "the limits of such coverage, less those amounts actually recovered under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." Ohio Rev.Code § 3937.18(A)(2) (1988). The Ohio courts have interpreted this provision as allowing insurers to deny coverage where the amount of the tortfeasor's liability insurance is equal to or greater than the amount of the injured party's underinsured motorist coverage and to take a set-off for the amount of liability insurance paid. *See James v. Michigan Mut. Ins. Co.*, 18 Ohio St.3d 386, 18 O.B.R. 440, 481 N.E.2d 272 (1985); *Ohio Casualty Ins. Co. v. Yoby*, 23 Ohio App.3d 51, 23 O.B.R. 96, 491 N.E.2d 360 (1985).

▓ It is equally clear that application of West Virginia law leads to a different result. In *State Automobile Mutual Insurance Co. v. Youler*, 183 W.Va. 556, 564, 396 S.E.2d 737, 745 (1990), we concluded that by enacting our uninsured/underinsured motorist coverage statute, W.Va. Code, 33–6–31(b) (1982), our legislature had "articulated a public policy ... that the

injured person be *fully compensated* for his or her *damages* not compensated by a negligent tortfeasor, up to the limits of the uninsured or underinsured motorist coverage." (Emphasis in original). In *Youler,* we held that set-off provisions, such as those contained in the Schoettker policy, which allow the insurer to reduce the amount of the insured's underinsured motorist benefits by any amounts paid under the tortfeasor's liability coverage, violate this public policy and are void.[4] *See also Bell v. State Farm Mut. Auto. Ins. Co.,* 157 W.Va. 623, 207 S.E.2d 147 (1974).

Later, in *Pristavec v. Westfield Insurance Co.*, 184 W.Va. 331, 400 S.E.2d 575 (1990), we held that in furtherance of this public policy of full compensation for the victims of underinsured drivers, our statute requires the insurer to pay underinsured motorist benefits even when the amount of the plaintiff's underinsured motorist coverage is equal to or less than the amount available to the plaintiff under the tortfeasor's liability insurance coverage.[5] Thus, under West Virginia law, the plaintiffs in this case would be entitled to underinsured motorist benefits under the Schoettker policy so long as the liability insurance available to them under the Thomas policy was inadequate to compensate them for their injuries.[6]

---

**4.** In Syllabus Point 4 of *Youler,* we stated:

"*W.Va.Code,* 33–6–31(b), as amended, on uninsured and underinsured motorist coverage, contemplates recovery, up to coverage limits, from one's own insurer, of full compensation for damages not compensated by a negligent tortfeasor who at the time of the accident was an owner or operator of an uninsured or underinsured motor vehicle. Accordingly, the amount of such tortfeasor's motor vehicle liability insurance coverage actually available to the injured person in question is to be deducted from the total amount of damages sustained by the injured person, and the insurer providing underinsured motorist coverage is liable for the remainder of the damages, but not to exceed the coverage limits."

In 1988, the legislature incorporated these principles into the underinsured motorist statute. *See* W.Va.Code, 33–6–31(b) (1988).

**5.** In Syllabus Point 5 of *Pristavec,* we stated:

"In light of the preeminent public policy of the underinsured motorist statute, which is to provide full compensation, not exceeding cov-

erage limits, to an injured person for his or her damages not .compensated by a negligent tortfeasor, this Court holds that underinsured motorist coverage is activated under *W.Va. Code,* 33–6–31(b), as amended, when the amount of such tortfeasor's motor vehicle liability insurance actually available to the injured person in question is less than the total amount of damages sustained by the injured person, regardless of the comparison between such liability insurance limits actually available and the underinsured motorist coverage limits."

**6.** The plaintiffs also assert that under West Virginia law they would be entitled to stack the underinsured motorist coverage on the other vehicle covered by the Schoettker policy. In Syllabus Point 5 of *Russell v. State Automobile Mutual Insurance Co.,* 188 W.Va. 81, 422 S.E.2d 803 (1992), however, we stated:

"West Virginia Code § 33–6–31 (1992) does not forbid the inclusion and application of an anti-stacking provision in an automobile insurance policy where a single insurance policy is issued by a single insurer and contains

### III.

In determining which law applies, we must first consider the type of issue involved. In *Lee v. Saliga*, 179 W.Va. 762, 766, 373 S.E.2d 345, 349 (1988), we recognized that cases involving uninsured motorist coverage "may raise questions of both tort and contract law. Where such a question involves an aspect of policy *coverage*, rather than *liability*, it is treated as a contract question for purposes of conflicts analysis. 1 A. Widiss, Uninsured and Underinsured Motorist Insurance § 7.15 (1985)." (Emphasis in original). In Syllabus Point 1 of *Lee*, we stated:

"Where in a suit for the recovery of uninsured motorist insurance benefits an issue arises which involves insurance coverage, that issue is to be resolved under conflict of laws principles applicable to contracts."

*Accord Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 182 W.Va. 580, 390 S.E.2d 562 (1990). In *Lee*, we noted that "questions of coverage" include issues relating to enforceability of exclusions in the policy, the availability of stacking, and the applicable limits of coverage. The parties apparently admit that the issues raised in the declaratory judgment action are questions of coverage warranting application of contracts principles of conflict of laws.

The general rule with regard to choice of law in contracts cases was stated in Syllabus Point 2 of *General Electric Co. v. Keyser*, 166 W.Va. 456, 275 S.E.2d 289 (1981):

" " The law of the state in which a contract is made and to be performed governs the construction of a contract when it is involved in litigation in the courts of this state'. Syl. pt. 1 (in part) *Michigan National Bank v. Mattingly*, 158 W.Va. 621, 212 S.E.2d 754 (1975)."

In Syllabus Point 2 of *Lee v. Saliga*, we modified this rule somewhat to reflect the modern approach to conflict of laws analysis contained in the Restatement (Second) of Conflict of Laws: [7]

"The provisions of a motor vehicle policy will ordinarily be construed according to the laws of the state where the policy was issued and the risk insured was principally located, *unless another state has a more significant relationship to the transaction and the parties.*" [8] (Emphasis added).

Our approval of this rule was motivated, in part, by the fact that it vindicates the reasonable expectations of the parties to the insurance contract:

"The usual coincidence of the insurance agent, insured, and the risk in the same state dictates that the parties would be more familiar with that state's insurance statutes, which often supplement or control the policy provisions. This law should control the reasonable expectation of the parties, rather than that of another state whose only connection to the dispute is the fortuity that the accident occurred there." *Lee v. Saliga*, 179 W.Va. at 769, 373 S.E.2d at 352.

" " The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.' "

an underinsured endorsement even though the policy covers two or more vehicles. Under the terms of such a policy, the insured is not entitled to stack the coverages of the multiple vehicles and may only recover up to the policy limits set forth in the single policy endorsement."
Consequently, on this issue, we would reach the same result whether we applied West Virginia law or Ohio law. *See Saccucci v. State Farm Mut. Auto. Ins. Co.*, 32 Ohio St.3d 273, 512 N.E.2d 1160 (1987); *Benson v. Rosler*, 19 Ohio St.3d 41, 19 O.B.R. 35, 482 N.E.2d 599 (1985); Ohio Rev.Code § 3937.18(G) (1988).

7.  In note 16 of *Lee v. Saliga*, 179 W.Va. at 769, 373 S.E.2d at 352, we quoted Section 193 of the Restatement (Second) of Conflict of Laws, which provides:

8.  It has also been recognized that the parties themselves may defeat the traditional conflict of laws principle applicable in contracts cases by making a choice of law in the contract. *See Joy v. Chessie Employees Fed. Credit Union*, 186 W.Va. 118, 411 S.E.2d 261 (1991); *Lee v. Saliga, supra.*

It is apparently undisputed that Ohio has the more significant relationship with the parties and the transaction at issue in this case. The plaintiffs and their decedents were residents of Ohio at the time of the accident. The insurance policy in question was issued in Ohio, and it appears that the vehicles covered thereby were registered and garaged in Ohio. In the absence of evidence to the contrary, we can assume that Ohio was "the principal location of the insured risk during the term of the policy." Rest. (Second) Conflict of Laws § 193.

■ By comparison, the parties' contacts with West Virginia were minor. The accident occurred here, and the owner and driver of the truck were West Virginia residents. These occurrences, however, have no bearing on the extent of the coverage afforded the plaintiffs under the terms of their insurance contract issued in Ohio. Upon these facts, we conclude that the parties reasonably expected the law of Ohio to control the interpretation of the insurance contract rather than the law of West Virginia, "whose only connection to the dispute is the fortuity that the accident occurred there." *Lee v. Saliga,* 179 W.Va. at 769, 373 S.E.2d at 352. *See Johnson v. Neal,* 187 W.Va. 239, 418 S.E.2d 349 (1992); *Liberty Mut. Ins. Co. v. Triangle Indus., Inc., supra.*

### IV.

The plaintiffs assert, however, that application of Ohio law in this case offends our public policy of full compensation for those injured by underinsured motorists underlying *State Automobile Mutual Insurance Co. v. Youler, supra.* They contend that fulfillment of this public policy should override the general conflict of laws principles enunciated in *Lee v. Saliga* and warrants application of West Virginia law in this case.

We have rarely discussed the effect of the forum state's public policy on the choice of law to be applied in insurance contract cases. In note 19 of *Lee v. Saliga,* 179 W.Va. at 770, 373 S.E.2d at 353, we recognized the general "conflict of laws principle that a state may ignore the laws of another state if it is contrary to its own public policy. *Paul v. National Life Ins. Co.,* [177 W.Va. 427, 352 S.E.2d 550 (1986)]; *State v. Hall,* 91 W.Va. 648, 114 S.E. 250 (1922); 2 Couch on Insurance § 16.48 (2d ed. 1984)." No public policy issue was raised in *Lee,* however, and we offered no further discussion of the issue.

In several cases following *Lee,* we mentioned in passing that public policy considerations may affect the choice of law in an insurance contract case. In *Liberty Mutual Insurance Co. v. Triangle Industries, Inc., supra,* we indicated, without discussion, that we would not follow the conflict of laws rule enunciated in *Lee* where application of foreign law violates the public policy of this state.[9] The matter also surfaced in our *per curiam* opinion in *Johnson v. Neal, supra,* in which we concluded that Virginia law concerning stacking of uninsured motorist coverages was applicable under the rule enunciated in *Lee v. Saliga.* In *Johnson,* we also cited *Lee* for the proposition that we would reject the application of foreign law when it violates our public policy, but offered no discussion except this brief statement: "[W]e decline to stretch West Virginia's public policy to require such an interpretation of an insurance contract made in Virginia between a Virginia company and a Virginia resident, especially when Virginia reached a different conclusion when it has addressed the specific issue of benefit stacking." 187 W.Va. at 244, 418 S.E.2d at 352. *See also Joy v. Chessie Employees Fed. Credit Union,* 186 W.Va. 118, 411 S.E.2d 261 (1991).

Obviously, the few cases in which we have mentioned public policy considerations with regard to the choice of law in an insurance contract case have not articulated a standard for applying such principles.

---

**9.** The Syllabus in *Liberty Mutual* states:

"In a case involving the interpretation of an insurance policy, made in one state to be performed in another, the law of the state of the formation of the contract shall govern, unless another state has a more significant relationship to the transaction and the parties, or the law of the other state is contrary to the public policy of this state."

A review of the decisions in other jurisdictions provides some help.

■ Most courts that have addressed the issue agree that the mere fact that the substantive law of another jurisdiction differs from or is less favorable than the law of the forum state does not, by itself, demonstrate that application of the foreign law under recognized conflict of laws principles is contrary to the public policy of the forum state. *See, e.g., Bethlehem Steel Corp. v. G.C. Zarnas & Co.,* 304 Md. 183, 498 A.2d 605 (1985); *Myers v. Government Employees Ins. Co.,* 302 Minn. 359, 225 N.W.2d 238 (1974); *Boardman v. United Servs. Auto. Ass'n,* 470 So.2d 1024 (Miss.1985); *State Farm Mut. Auto. Ins. Co. v. Simmons' Estate,* 84 N.J. 28, 417 A.2d 488 (1980); *Cooney v. Osgood Mach., Inc.,* 179 A.D.2d 240, 582 N.Y.S.2d 873 (1992); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670 (Tex. 1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). *See generally* 16 Am.Jur.2d *Conflict of Laws* §§ 18, 20 (1979).[10] In practice, however, courts have had difficulty applying this principle in insurance contract cases where the parties' contacts with another state would otherwise warrant application of foreign law.

In *Andrews v. Continental Insurance Co.,* 444 So.2d 479 (Fla.App.), *review denied,* 451 So.2d 847 (Fla.1984), for example, the court found no Florida public policy implicated in the enforcement of the uninsured motorist provisions of an insurance policy issued in Maine to a Maine resident, even though the accident occurred in Florida and enforcement of the contract was contrary to Florida's collateral source statute. In *Wille v. Farm Bureau Mutual Insurance Co.,* 432 N.W.2d 784 (Minn.App. 1988), on the other hand, the court refused to enforce anti-stacking provisions of an insurance contract issued in Iowa to a resident of Iowa, concluding that because Minnesota was the site of the accident and the domicile of the other driver and because the insurer was licensed to do business there, Minnesota had a governmental

interest in construing the contract according to Minnesota law, which the court termed the "better rule."

Some states have attempted to clarify this issue by focusing on the nature of the public policy underlying the substantive law of the forum state. In *Hart v. Allstate Insurance Co.,* 83 Md.App. 642, 646, 577 A.2d 373, 375 (1990), *rev'd on other grounds,* 327 Md. 526, 611 A.2d 100 (1992), the court stated: "[M]erely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy and thus unenforceable in our courts. Rather, for another state's law to be unenforceable, there must be *'a strong public policy against its enforcement* in Maryland[.]' " Quoting *Bethlehem Steel Corp. v. G.C. Zarnas & Co.,* 304 Md. at 189, 498 A.2d at 608. (Emphasis added). A similar statement appears in *Boardman v. United Services Automobile Association,* 470 So.2d at 1038, where the Mississippi Supreme Court held: "[O]ne of the important principles we enforce is that no foreign state's substantive law will be enforced in courts of this state where to do so would be offensive to the deeply ingrained or strongly felt public policy of the state."

A more detailed analysis of this approach was attempted by the New Jersey Supreme Court in *State Farm Mutual Automobile Insurance Co. v. Simmons' Estate, supra,* where the issue was whether the decedents had the insured's permission to use the covered vehicle so as to entitle their estates to benefits under the insured's motor vehicle liability policy. The insured was a resident of Alabama and the policy was issued there, but the accident occurred in New Jersey. New Jersey and Alabama had virtually identical statutes on the subject, but the interpretation placed on the Alabama statute by the courts of that state was more restrictive and would have precluded recovery.

After determining that Alabama had the more significant contacts with the parties

---

**10.** A question that is rarely addressed by the courts is what type of statutes, case decisions, or constitutional mandates are sufficiently affected with a general public interest to constitute "public policy."

and the transaction, the New Jersey court turned to the argument that application of Alabama law violated New Jersey public policy:

"Even though Alabama decisional law is considerably more restrictive and narrow than is New Jersey law with regard to the extent of insurance coverage, ... it has been recognized that not all differences in the laws of two states demonstrate inconsistent public policies or interests.... Unless such differences are fundamental, foreign law need not be considered offensive or repugnant to local public policy....

"Here the difference in the insurance laws of each state as to the extent of coverage accorded to an insured's permittee does not implicate the fundamental public policy of these states. Both states recognize that persons are entitled to the benefits of liability insurance when injured in accidents in which the vehicle was being driven by one who had obtained the use of the vehicle with the consent or permission of the insured. While each state differs as to the duration and character of that permission or consent, the public policy of each state nevertheless seeks to achieve the same fundamental goals and objectives.

"The distinctions between these states as to the extent of coverage do not in the context of this case demand the full and literal application of the insurance laws of New Jersey to determine the obligations of the parties in order to vindicate the public policy of this State." 84 N.J. at 41–42, 417 A.2d at 495. (Citations omitted).

The obvious disadvantage to this approach is that it requires a subjective analysis of the nature of the particular public policy asserted. We do not believe that such an analysis is necessary in this case. ■■■■ Our substantive law governing uninsured and underinsured motorist coverages in motor vehicle insurance policies is intended to apply only to insurance transactions which occur in West Virginia or which affect the rights and responsibilities of West Virginia citizens. For this reason, the public policy of full compensation underlying our uninsured/underinsured motorist law is implicated only when the parties and the transaction have a substantial relationship with this state. The importance of the public policy is directly proportional to the significance of that relationship. The more marginal the contact West Virginia has with the parties and the insurance contract, the less reason there is to consider the public policy behind our uninsured/underinsured motorist law as a factor bearing on the choice of law determination.

■■■■ When the issue is viewed in this light, it is clear that the public policy concerns raised by the plaintiffs are adequately addressed by application of the significant relationship test approved by this Court in *Lee v. Saliga*. This approach provides an answer to questions which inevitably arise any time there is a conflict between the laws of one state and the laws of another. It is also consistent with promoting the reasonable expectations of the parties to the insurance contract, an important premise for our adoption of the conflicts rule stated in *Lee v. Saliga*. The reasonable expectations of the parties with respect to the terms of an insurance contract should not be lightly disregarded. *See National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987). Finally, we believe that this approach is not inconsistent with the results reached by the majority of courts that have addressed the issue. *See, e.g., Andrews v. Continental Ins. Co., supra; Draper v. Draper*, 115 Idaho 973, 772 P.2d 180 (1989); *Boardman v. United Servs. Auto. Ass'n, supra; Sotirakis v. United Serv. Auto. Ass'n*, 106 Nev. 123, 787 P.2d 788 (1990); *State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, supra; Dairyland Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 41 Wash.App. 26, 701 P.2d 806, *review denied*, 104 Wash.2d 1016 (1985).

■■■■ Consequently, we conclude that where a choice of law question arises with regard to the interpretation of coverage provisions in a motor vehicle insurance policy executed in another state, the public

policy considerations inherent in the fact that the substantive law of the other state differs from our own will ordinarily be adequately addressed by application of the significant relationship conflict of laws test enunciated in Syllabus Point 2 of *Lee v. Saliga.*

 This is not to say that an analysis of public policy is unnecessary in every conflict of laws case. We adhere to the general principle that a court should not refuse to apply foreign law, in otherwise proper circumstances, on public policy grounds unless the foreign law "is contrary to pure morals or abstract justice, or unless enforcement would be of evil example and harmful to its own people." 16 Am.Jur.2d *Conflict of Laws* § 18. (Footnote omitted).

Thus, our conclusion does not foreclose separate consideration of public policy questions such as the one addressed in *Joy Technologies, Inc. v. Liberty Mutual Insurance Co.,* 187 W.Va. 742, 421 S.E.2d 493 (1992). In *Joy Technologies,* public policy played a part in our rejection of Pennsylvania law as controlling the meaning of an exclusionary clause in a commercial liability policy issued in Pennsylvania to a Pennsylvania corporation. Quite apart from our analysis of the relationship of the parties and the transaction to this state, we held that because the insurer, in seeking approval of the exclusionary clause, had misrepresented to state insurance officials the meaning and effect of the clause, enforcement of the contract under Pennsylvania law would be contrary to

> "[t]he public policy of the State of West Virginia ... that the law of the State should be administered in such a way as to insure that corporations which seek to do business in West Virginia act in a manner consistent with their studied, unambiguous, official, affirmative representations to the State, its subdivisions, or its regulatory bodies." Syllabus Point 2, in part.

In *Joy Technologies,* however, the public policy issue did not arise from the conflict between the substantive law of Pennsylva-

nia and West Virginia, but rather from the wrongdoing of the insurer.

 No similar public policy is at issue in this case. As we have already noted, the parties and the insurance transaction involved in this case have a more significant relationship with Ohio than with West Virginia. The only contacts with this state were the fact that the accident occurred here and was caused by a West Virginia resident. However, the relevant aspects of that transaction have been settled, and are not at issue in this proceeding against Liberty Mutual. The real controversy here is the interpretation of the provisions of the plaintiffs' underinsured motorist coverage. The insurance contract was executed in Ohio. The plaintiffs are residents of Ohio, and the covered vehicles are principally garaged there.

The plaintiffs have not demonstrated that application of Ohio law in this case will have an adverse impact on the citizens of this state. If we allow the public policy underlying our uninsured/underinsured motorist law to control choice of law every time there is a difference between our law and the law of another jurisdiction, we will essentially abolish the conflict of laws rule set forth in *Lee v. Saliga.* This we decline to do. Consequently, we conclude that no public policy of this state will be violated by enforcement of Ohio law with regard to the interpretation of the insurance contract in question.

## V.

For the reasons stated above, we answer the certified question by holding that the substantive law of the State of Ohio governs the interpretation of the insurance agreement between the parties.

Answered and dismissed.