EDMUND A. SARGUS, JR., CHIEF UNITED STATES DISTRICT JUDGE
Choice of Law
In this case, the parties dispute which state law applies to their claims. The plant *1024 that discharged the water contaminated with ammonium perfluorooctanoate ("C-8") is in West Virginia. Some of the plaintiffs reside in Ohio and some in West Virginia. Additionally, some of the plaintiffs have filed suit in the state in which they do not reside.
The issue of which state law will be applied to the individual plaintiffs' claims that make up this MDL was initially brought before the Court in Plaintiffs' First Motion for Summary Judgment. (ECF No. 820.) In that motion, the plaintiffs requested that the Court apply the law of the state of West Virginia to all of the plaintiffs' who make such election. The defendant, however, argued that it is the law of the state in which the injury occurred that must be applied. The parties also discussed the issue at the oral argument on November 13, 2014. (ECF No. 1519.) The Court ordered simultaneous supplemental briefing on the issue in Pretrial Order No. 31. (ECF No. 2032.) The parties timely filed their briefs. (ECF Nos. 2284, 2285, 2416, 2417.) On May 6, 2015, the Court held oral argument on this issue. (ECF No. 3235.) For the reasons set forth below, the Court DENIES the portion of Plaintiffs' First Motion for Summary Judgment (ECF No. 820) related to the choice of law request.
I.
On August 31, 2001, a group of individuals filed a state court action in West Virginia against E.I. du Pont de Nemours and Company ("DuPont") captioned Leach v. E. I. du Pont de Nemours & Co. , No. 01-C-698 (Wood County W. Va. Cir. Ct.) ("Leach Case"). The plaintiffs in the Leach Case brought a variety of claims under West Virginia common law tort theories for equitable, injunctive and declaratory relief, along with compensatory and punitive damages, as a result of alleged drinking water contamination.
On April 10, 2002, the West Virginia trial court ("Leach Court") granted the plaintiffs' motion for class certification and certified a mandatory, non-opt-out class ("Leach Class")
on behalf of a class of all persons whose drinking water is or has been contaminated with ammonium perfluorooctanoate (a/k/a/ "C-8") attributable to releases from DuPont's Washington Works plant (hereinafter "the Class") with respect to all issues relating to [DuPont's] underlying liability and Plaintiffs' claims for equitable, injunctive, and declaratory relief, including liability for punitive damages; all damage issues involving any determination of individual harm of the Class members and the amount of any punitive damages are hereby STAYED and RESERVED for later litigation ....
Leach v. E.I. Du Pont de Nemours & Co. , No. 01-C-608, 2002 WL 1270121, at *1 (W. Va. Cir. Ct. Apr. 10, 2002). The Class included approximately 80,000 individual residents of the communities served by certain public water districts and private water sources that had allegedly been contaminated with C-8 discharged from DuPont's Washington Works plant. The water districts and private water sources were all in either Ohio or West Virginia.
In November 2004, the parties entered into a class-wide settlement of the Leach Case ("Leach Settlement Agreement"). On February 28, 2005, following appropriate class-wide notice, objection opportunities, full opt-out opportunities, and a final fairness hearing, the Leach Court entered an order approving the Leach Settlement Agreement and entering final judgment in the action. The Leach Settlement Agreement provides for a process by which a determination would be made as to which individual class members, if any, would be permitted to file personal injury and *1025 wrongful death actions, referred to as "Conditionally Releases Claims," in the "later litigation" against DuPont based on any of the human diseases they believed had been caused by exposure to C-8. (Leach Settlement Agreement "SA" § 3.3; ECF No. 820-8.) Pursuant to this procedure, a Science Panel was tasked to issue either Probable Link Findings or No Probable Link Findings for human diseases the Leach Class alleged were caused by C-8. The class members agreed "not to file any action or proceedings against [DuPont] based on the Conditionally Released Claims unless and until the Science Panel delivers a Probable Link Finding ... with respect to the specific Human Disease at issue in the Conditionally Released Claim." Id.
In 2011 and 2012, the Science Panel delivered Probable Link Findings for six human diseases ("Linked Diseases"). Subsequently, the individual class members whose claims are based on one or more of the Linked Diseases began to file their Conditionally Released Claims in actions in West Virginia and in Ohio. Some of the plaintiffs lived in Ohio and were allegedly injured in Ohio when they drank the water contaminated with C-8 in Ohio ("Ohio Plaintiffs"), and some of the plaintiffs were allegedly injured in West Virginia when they drank C-8 contaminated water in West Virginia ("West Virginia Plaintiffs"). Some Ohio Plaintiffs filed their cases in Ohio alleging claims under Ohio law and some Ohio Plaintiffs filed their cases in West Virginia alleging their claims under West Virginia law.
DuPont moved the United States Judicial Panel on Multidistrict Litigation for centralization of these individual actions pursuant to 28 U.S.C. § 1407. The Judicial Panel granted DuPont's request. On April 9, 2013, the Judicial Panel transferred the centralized action to this Court. In the Transfer Order the Judicial Panel described the individual cases that make up this multidistrict litigation ("MDL") as follows:
All the actions are personal injury or wrongful death actions arising out of plaintiffs' alleged ingestion of drinking water contaminated with a chemical, C-8 (also known as perfluorooctoanoic acid (PFOA) or ammonium perfluorooctanoate (APFO)), discharged from DuPont's Washington Works Plant near Parkersburg, West Virginia. All of the plaintiffs in this litigation allege that they suffer or suffered from one or more of six diseases identified as potentially linked to C-8 exposure by a study conducted as part of a 2005 settlement between DuPont and a class of approximately 80,000 persons residing in six water districts allegedly contaminated by C-8 from the Washington Works Plant [ ("Leach Settlement Agreement") ]. See Leach v. E.I. Du Pont de Nemours & Co. , No. 01-C-608 (W. Va. Cir. Ct.).
(Transfer Order; ECF No. 1 at 1.) Currently there are approximately 2,500 individual cases in this MDL and the first trial is scheduled to be held in September 2015.
II.
Reviewing all of the briefing and arguments that have been made to the Court (ECF Nos. 820, 1031, 1032, 1152, 1209, 1407, 1519), including the oral argument held on May 6, 2015, the issue may be framed as a disagreement between the parties as to (A) the impact of the Leach Case on a choice-of-law analysis, (B) the impact of the Leach Settlement Agreement on a choice-of-law analysis, and (C) the results of a choice-of-law analysis under the principles traditionally applied by an MDL court.
*1026 A. The Leach Case
In their First Motion for Summary Judgment, the plaintiffs contend that all of the individual cases that make up this MDL are properly considered "first filed against DuPont on August 30, 2001, in a West Virginia state court, to be resolved under West Virginia law." (Pls' Supp. Brief at 2; ECF No. 2285.) The plaintiffs offer the following as support for their position:
(1) that all current MDL plaintiffs purport to be members of a class of plaintiffs; (2) whose claims were first filed against DuPont in August of 2001; (3) through the filing of a class action complaint in a West Virginia state court; and (4) which claims were all certified by that West Virginia court (the Leach Court) to proceed against DuPont as class claims in April of 2002. (First MSJ at 2-4)
Plaintiffs further noted that, although the class included plaintiffs who may be living in jurisdictions other than West Virginia (such as Ohio), no party (including DuPont) ever challenged any non-resident class member's ability or standing to pursue the certified claims through the West Virginia state court under West Virginia law or the court's jurisdiction over any such non-resident class members. (See id. at 3-4) This remained true even after the parties entered a class-wide settlement and provided full "objection" and hearing opportunities before the settlement was approved and finalized by that West Virginia state court in 2005. (See id. at 3-4) Consequently, all objections to any such choice of West Virginia law or jurisdiction were waived, and all appeal periods have run. (Id. at 4)
Id. at 3.
In their current briefing, the plaintiffs expand this argument, contending that "all of the claims currently pending in this MDL are those that were 'preserved' by the West Virginia Leach Court in 2005, subject to being 'pursued' again by Plaintiffs qualifying as 'Class Members' only if and when permitted in accordance with and pursuant to the express terms and conditions of their written contract with DuPont set forth in the Leach Agreement.... [which was not permitted until] the Science Panel's work was complete." Id. at 5. The plaintiffs maintain that these "preserved" claims have the same attributes as a claim filed in the Leach Case in that they are, inter alia , to be considered filed on the date the Leach Case was filed and decided under West Virginia law, referring to the Leach Case as the first phase of litigation and this MDL as the second phase.
DuPont responds that "nothing in the Leach Agreement supports the notion that 'preserving' (i.e. , not releasing) potential future claims that might be 'pursued' (i.e. , 'filed') at a later time allows a plaintiff to backdate" the filing date of those claims. (DuPont's Response to Pls' Supp. Brief at 12; ECF No. 2416.) DuPont maintains that the "preserved" claims cannot be "revived" in a "second phase" of the Leach Case, but instead they were "carved out" for preservation for potential future litigation after resolution of the Class claims, which is a common occurrence in class actions. (DuPont's Response to Pls' Supp. Brief at 12; ECF No. 2416) (citing as an example Fresco v. Auto Data Direct, Inc. , No. 03-61063-CIV, 2007 WL 2330895, at *5, 2007 U.S. Dist. LEXIS 37863, at *13-14 (S.D. Fla. May 11, 2007) ) ("In exchange for the injunctive-relief program, the Settlement Agreement releases settlement class members' claims for equitable relief, statutory liquidated damages, and punitive damages predicated on such claims, but it preserves the right of individual class members to bring individual claims for actual damages, subject to a waiver of the class action *1027 procedural device.") DuPont's argument is well taken.
As DuPont accurately points out, on April 10, 2002, the Leach Court entered an order certifying a liability and medical monitoring class, but expressly reserved all personal injury and wrongful death claims for future litigation "after resolution of the Class claims." Leach v. E. I. du Pont de Nemours and Company , No. 01-C-608, 2002 WL 1270121, at *18 (W. Va. Cir. Ct. Wood Cty. Apr. 10, 2002) (emphasis supplied). And, although the 2002 class definition indicated that the Conditionally Released claims were stayed and preserved, that definition was modified in the Leach Settlement Agreement, which provides that the Agreement was entered into by DuPont and the Class Members as defined in the Agreement.[1] (SA at 1 ¶ 1.) The Leach Settlement Agreement specifically indicates that the " 'Certified Class' shall have the meaning provided in Section 2.1.1." (SA § 1.9.) That Section utilizes a portion of the definition from the April 10, 2002 Order of the Leach Court, quoted above, that granted the plaintiffs' request for class certification. Specifically, the class in the Leach Settlement Agreement was defined as "all persons whose drinking water is or has been contaminated with ammonium perfluorooctanoate (a/k/a "C-8") attributable to releases from DuPont's Washington Works plant... with respect to all issues relating to Defendants' underlying liability and Plaintiffs' claims for equitable, injunctive and declaratory relief including liability for punitive damages." (SA § 2.1.1.)
Thus, DuPont contends that this redefined settlement class received immediate benefits provided in the Leach Settlement Agreement, including "a $70,000,000 cash payment by DuPont to the class; additional funds paid to class counsel; filtered drinking water to all Class Members from DuPont's construction or installation and ongoing maintenance of state-of-the-art water treatment facilities at a cost of many millions of dollars; and a promise by DuPont of medical monitoring for the class ...." (DuPont's Response to Pls. Supp. Brief at 8; ECF No. 2416.) DuPont's assessment is supported in the Leach Court's Final Order captioned "Order Approving Final Settlement and Notice Plan and for Entry of Final Judgment," in which the court adopted the Leach Settlement Agreement. In that Final Order, the Leach Court did not stay any individual action to be revived at a later point in time, or retain any jurisdiction over future individual lawsuits that may be brought, but instead provided:
There are no remaining issues to be litigated in this matter , as the Settlement sets forth adequately the agreed upon mechanism to determine whether the Conditionally Released Claims will be dismissed by this Court or whether some Class members may pursue individual claims against DuPont.
(DuPont's Response to Pls' Supp. Brief, Ex. A; ECF No. 2416-1.) By this Order the Leach Court entered judgment in that class action. Since the entry of judgment in the Leach Case, no MDL plaintiff has filed his or her action on the Conditionally Released Claims in the Leach Case. Rather, the plaintiffs have filed their actions separately in state and federal courts in Ohio and in West Virginia.
*1028 Additionally, if the Court were to accept the plaintiffs' position, it would render unnecessary the Leach Settlement Agreement's provisions for tolling of the statute of limitation that would have been applicable to the Conditionally Released Claims. (SA § 6) ("the Conditionally Released Claims, ... shall be deemed tolled from August 30, 2001 through and including the date on which the Science Panel delivers to the Administrator a Probable Link Finding with respect to the particular Human Disease(s) at issue in the Conditionally Released Claim"). If the parties agreed that the Conditionally Released Claims would be considered first filed in August 2001, there would be no need to provide for tolling of the statute of limitations since the statute of limitations could not run on claims that were filed and remained pending.
All that being said, the Court agrees with the plaintiffs' suggestion that this MDL may, in some aspects, be viewed as a second phase of the Leach Case. That is, the preserved claims are certainly impacted by the Leach Settlement Agreement and in certain important respects governed by it. (See e.g. , Dispositive Motions Order No. 1; ECF No. 1679.) It is, however, outside of the Agreement's reach to provide a mechanism for considering all of the Conditionally Released Claims as being actually accrued and filed at the same time that the Leach Case was filed. The Court, therefore, declines to accept the proposed legal fiction that would present the individual claims in this MDL as being filed in August 2001.
B. The Leach Settlement Agreement
The plaintiffs contend that the Leach Settlement Agreement's choice of law provision is applicable to the causes of action brought by each individual plaintiff in this MDL. The plaintiffs reason that "the Parties already agreed on a choice-of-law provision to govern any question regarding what law applies under the terms of the Leach Agreement." (Pls' Supp. Brief at 6; ECF No. 2285.) That provision is contained in the "Miscellaneous Provisions" section of the Leach Settlement Agreement and provides in its entirety:
14.3. Governing Law. This Agreement shall be governed by the laws of the State of West Virginia without giving effect to the conflict of laws or choice of law provisions thereof, except to the extent that the law of the United States governs any matter set forth herein, in which case such federal law shall govern.
DuPont, however, argues that the plaintiffs "are mistaken to the extent that they rely on the narrow choice-of-law clause contained in Section 14.3 of the Leach Settlement Agreement to argue that West Virginia law should apply to all actions in this MDL, as that provision only addresses which state's law should govern interpretation of that contract, not which state's substantive law should apply in future individual tort actions." (DuPont's Supp. Brief at 9; ECF No. 2284.) DuPont continues, stating that "Section 14.3 is plainly intended to address disputes that arise from performance of the Parties' obligations under that Agreement. There is absolutely nothing in the text of the Agreement or otherwise to suggest that Section 14.3 was intended to direct the choice of law analysis for future, individual personal injury lawsuits." (DuPont's Response to Pls' Supp. Brief at 2; ECF No. 2416.) This Court agrees.
Courts interpreting substantially similar contract provisions consistently find that the language relates to interpretation of the contract at issue and not to related tort claims. Those courts explain that the use of the limiting language "this agreement" or "this contract" does not encompass non-contract claims. See , e.g. , *1029 Cavcon, Inc. v. Endress + Hauser, Inc. , 557 F.Supp.2d 706, 720 (S.D. W. Va. 2008) (finding that the plaintiff's negligence and fraud counts were "tort or quasi-tort claims, which d[id] not require an interpretation of the agreement," and applying West Virginia law to those counts despite a valid out-of-state choice-of-law provision in the underlying contract); Carideo v. Dell, Inc. , 706 F.Supp.2d 1122, 1127 (W.D. Wash. 2010) (concluding that a choice-of-law provision in a contract that stated "this agreement and any sales thereunder shall be governed by the laws of the State of Texas, without regard to conflicts of laws rules" did not encompass subsequent tort and consumer protection claims arising out of or related to the contract); Melton v. Precision Laser & Instrument, Inc. , No. 2:12-cv-1697, 2013 WL 210900, at *4, 2013 U.S. Dist. LEXIS 7982, at *12 (S.D. W. Va. Jan. 18, 2013) (finding that because plaintiff's negligence and fraud claims "sound in tort rather than in contract," they were not "controlled" by choice of law provision that stated "This Agreement shall be construed and enforced in accordance with and shall be governed by the laws of the Commonwealth of Pennsylvania."); Williams v. Deutsche Bank Secs., Inc. , No. 04 Civ. 7588, 2005 U.S. Dist. LEXIS 12121, at *13 (S.D. N.Y. June 13, 2005) ("For a choice-of-law clause to apply to tort claims between the parties, parties to a contract must include language stating that the chosen state law will govern "all matters, including, but not limited to, matters of validity, construction, effect or performance."); Medline Indus. v. Maersk Med. , 230 F.Supp.2d 857 (N.D. Ill. 2002) (finding that choice of law provision in contract that stated "this agreement shall be subject to English Law" did not mean that English law governed tortious conduct or other actions relating to their relationship).
The plaintiffs' attempt to distinguish these cases on the contention that, unlike them, "the Leach Agreement specifically relates to the currently-pending 'preserved' claims." (Pls' Response to DuPont's Supp. Brief at 2-3; ECF No. 2417.) The Court is unclear how this statement causes the language in the choice of law provision to encompass the tort claims that are brought in this MDL. The language utilized in the Leach Settlement Agreement is routinely interpreted as relating only to interpretation of the contract, and not to subsequent related tort claims. Courts have required much more than language like that used in § 14.3 for the provision to encompass subsequent tort claims. See e.g., Brazil v. Dell Inc. , 585 F.Supp.2d 1158 (N.D. Cal. 2008) (finding that the use of the following expansive language did encompass later tort claims between the parties: "THIS AGREEMENT, ANY SALES THERE UNDER, OR ANY CLAIM, DISPUTE OR CONTROVERSY ... INCLUDING STATUTORY, COMMON LAW, AND EQUITABLE CLAIMS ... BETWEEN CUSTOMER AND DELL, arising from or relating to this agreement, its interpretation, or the breach, termination or validity thereof, the relationships which result from this agreement, Dell's advertising, or any related purchase, SHALL ... BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO CONFLICTS OF LAWS RULES.").
The plaintiffs and DuPont made express agreements regarding the preservation of the Conditionally Released Claims, including what claims could be brought, when those claims could proceed, how the statute of limitations would apply, and whether DuPont would contest general causation. The parties could have expressly included a choice of law provision that would be applicable to these preserved claims but did not. The choice of law provision utilized is relatively modest in scope and does not overtly state that the *1030 clause covers the preserved tort claims. Consequently, the Court finds that the choice of law provision in the Leach Settlement Agreement is not applicable to the individual tort claims that have been centralized in this MDL.
C. Choice of Law
"[T]he choice-of-law principles that the transferor court will apply are those of the State where the transferor court sits, and not, for example, the choice-of-law principles of Ohio, where the MDL court sits." In re Welding Fume Products Liab. Litig. , No. 1:03-CV-17000, 2010 WL 7699456, at *12 (N.D. Ohio June 4, 2010). "This is because: (1) '[i]n diversity cases [a court must] apply the choice-of-law rules ... of the forum state;' and (2) '[i]n MDL cases, the forum state is typically the state in which the action was initially filed before being transferred to the MDL court.' " Id. (citing CenTra, Inc. v. Estrin , 538 F.3d 402, 409 (6th Cir. 2008) ; Klaxon Co. v. Stentor Elec. Mfg. Co. , 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ; In re Vioxx Prods. Liab. Litig. , 239 F.R.D. 450, 454 (E.D. La. 2006) ). "Given that a case remanded by [an] MDL Court to a transferor court was originally filed in either that transferor court, or in a State court within that federal district before removal, it is the choice-of-law principles of the State where the transferor court sits that will apply." Id. All of the cases centralized in this MDL were filed either in Ohio or in West Virginia. Consequently, Ohio choice of law rules apply to cases filed in Ohio, and West Virginia choice of law rules apply to cases filed in West Virginia.
Of course, the Court "must conduct conflict of laws analysis only if there is an actual conflict between local law and the law of another jurisdiction." Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc. , 852 F.Supp.2d 925, 937 (S.D. Ohio 2012). As the parties agree, with regard to the majority of the claims themselves, there is not conflict between Ohio or West Virginia law. These two states part ways, however, when it comes to the amount of damages available to a successful plaintiff whose injury accrued after April 7, 2005, the date that Ohio enacted tort reform legislation that caps certain compensatory and punitive damages. See Ohio Rev. Code §§ 2315.18, 2315.21. West Virginia has no such law. Because Ohio's tort reform statute does not apply retroactively, all of the claims that accrued before its enactment will require no choice of law analysis related to the plaintiffs' personal injury claims.[2] See Ohio Rev. Code § 1.48 (this statute is not expressly declared to be retroactive and under Ohio law, "statutes are presumed to apply prospectively unless expressly declared to be retroactive."); see also Heffelfinger v. Connolly , No. 3:06-CV-2823, 2009 WL 112792, at *2 (N.D. Ohio Jan. 15, 2009) (holding that Ohio's damages cap legislation, effective on April 7, 2005, has no retroactive effect).
With regard to those plaintiffs whose injuries accrued after April 7, 2005, the Court must determine which state's law applies. There are potentially four groups of plaintiffs for which this determination must be made. There are (1) the Ohio Plaintiffs who filed their cases in Ohio, (2) the Ohio Plaintiffs *1031 who filed their cases in West Virginia, (3) the West Virginia Plaintiffs who filed their cases in West Virginia, and (4) the West Virginia Plaintiffs who filed their cases in Ohio.
1. Cases Filed in West Virginia
As explained above, West Virginia's choice of law principles apply to all cases filed in West Virginia. In West Virginia the doctrine of lex loci delicti is utilized in tort actions. Cavcon Inc. v. Endress + Hauser, Inc. , 557 F.Supp.2d 706, 720 (S.D. West Va. 2008) (citing State of West Virginia ex rel. Chemtall Inc. v. Madden , 216 W. Va. 443, 447, 607 S.E.2d 772 (2004) ; Paul v. National Life , 177 W. Va. 427, 352 S.E.2d 550 (1986) ). "[T]hat is, the substantive rights between the parties are determined by the law of the place of injury." Id. (citations omitted). Therefore, under this general principle, the West Virginia Plaintiffs who filed in their home state will have West Virginia law applied to their personal injury claims and the Ohio Plaintiffs who filed their actions in West Virginia will have Ohio law applied to their personal injury claims.
With regard to the Ohio Plaintiffs who filed in West Virginia, the Court must determine whether application of Ohio law would contravene West Virginia public policy. Paul v. Nat'l Life , 177 W. Va. 427, 433, 352 S.E.2d 550 (1986). West Virginia has "long recognized that comity does not require the application of the substantive law of a foreign state when that law contravenes the public policy of [West Virginia]." Id. The plaintiffs argue that application of Ohio's tort reform statute does indeed contravene West Virginia's policy that an injured person deserves full compensation for her injuries. DuPont contends that the relevant authority is contrary to the plaintiff's position.
"West Virginia's public policy exception 'is necessarily a narrow one, to be invoked only in extraordinary circumstances.' " Mulvey Const., Inc. v. Bituminous Cas. Corp. , 571 F. App'x. 150, 157 (4th Cir. 2014) (citation omitted). "The West Virginia Supreme Court has recognized that '[t]he mere fact that the substantive law of another jurisdiction differs from or is less favorable than the law of the forum state does not, by itself, demonstrate that application of the foreign law under recognized conflict of laws principles is contrary to the public policy of the forum state.' " Id. (quoting Nadler v. Liberty Mut. Fire Ins. Co. , 188 W.Va. 329, 424 S.E.2d at 258 (syllabus pt. 3) (1992) ). That court "instructed lower courts not to refuse to apply foreign law 'unless the foreign law is contrary to pure morals or abstract justice, or unless enforcement would be of evil example and harmful to [West Virginia's] own people.' " Id. (quoting Nadler , 424 S.E.2d at 265 ). The West Virginia Supreme Court has made clear that it "does not take a request to invoke [West Virginia's] public policy to avoid application of otherwise valid foreign law lightly." Howe v. Howe , 218 W. Va. 638, 646, 625 S.E.2d 716 (2005) (holding that the "Appellant has not demonstrated the strong public policy necessary to avoid application of Ohio law in this matter.") (citing Nadler, supra ).
The West Virginia Supreme Court case of Nadler v. Liberty Mutual Fire Insurance Company is instructive. In Nadler as in the case sub judice , application of Ohio law limited the damages available to the plaintiff. The Nadler plaintiff, an Ohio resident, brought suit in West Virginia against his motorist insurance provider following an injury accident. The plaintiff filed suit after the insurance provider, relying on Ohio law, refused to pay any amounts that exceeded his accident limitation of underinsured motorist coverage. Plaintiff contended that the West Virginia's public policy of "full compensation for those injured" precluded the application of Ohio law that limited recovery under his policy. The *1032 West Virginia Supreme Court rejected this argument and upheld application of the Ohio damages cap. This was the result even though doing so resulted in the plaintiff not being able to fully recover damages.
Further, Paul v. National Life , the only case upon which the plaintiffs rely, is inapposite. 177 W. Va. 427, 352 S.E.2d 550 (1986). In Paul , West Virginia's highest court considered whether the lower court's application of Indiana's automobile guest statute violated West Virginia public policy, concluding that it did. The Paul court noted that application of the Indiana statute left the family of a woman killed in a car accident in Indiana without any cause of action. The court explained that "West Virginia has never had an automobile guest passenger statute .... [and i]t is the strong public policy of this State that persons injured by the negligence of another should be able to recover in tort." Paul , 177 W. Va. at 433, 352 S.E.2d 550. Application of the Indiana statute in that case contravened West Virginia public policy because it prevented any recovery in tort. It did not contravene public policy by limiting the recovery of the injured party, but instead by actually eliminating the cause of action. Moreover, the Court notes that West Virginia has a law that caps damages in medical malpractice actions, which indicates that the state is not opposed to damages caps as a general matter. See West Virginia Code § 55-7B-8.
Thus, the Court concludes that the plaintiffs cannot show that application of Ohio's tort reform statute is contrary to pure morals or abstract justice, or enforcement of it would be of evil example and harmful to the people of West Virginia. Consequently, West Virginia choice-of-law principles dictate that the Ohio Plaintiffs who filed their cases in West Virginia will have Ohio law applied to their claims.
2. Cases Filed in Ohio
Ohio "abandon[ed] a strict adherence to the traditional rule of lex loci delicti in favor of a more flexible rule based on which state has 'a more significant relationship to the lawsuit,' id. at 289, in light of the factors set forth in section 145 of 1 Restatement (Second) of Conflict of Laws § 145 (1971)." In re Bendectin Litig. , 857 F.2d 290, 304 (6th Cir. 1988) (citing Morgan v. Biro Mfg. Co. , 15 Ohio St.3d 339, 474 N.E.2d 286 (1984) (per curiam) ). "Applying here the flexible approach adopted in recent Ohio case law and codified in sections 145 and 6 requires an inquiry into which state possesses the most significant relationship. If this question cannot be determined, the law of the place of the injury controls." Id. (citing Morgan, supra ; 1 Restatement (Second) of Conflict of Laws § 146 (1971) ). "If an action is deemed to be a tort action, section 146 applies, and the law of the state where the injury occurred presumptively controls." Miller v. State Farm Mut. Auto. Ins. Co. , 87 F.3d 822, 824-25 (6th Cir. 1996) (citing Morgan, supra ).
Section 145 of the Second Restatement of Conflict of Laws provides that when determining the state with the most significant relationship, a court should consider (1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 which the court may deem relevant to the litigation. See 1 Restatement (Second) of Conflict of Laws § 145. The Section 6 factors include: (a) the needs of the interstate and international system; (b) the relevant policies of the forums; (c) the relevant policies of other interested states and the relative interest of those states in *1033 the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. See 1 Restatement (Second) of Conflict of Laws § 6.
In the instant action the plaintiffs argue:
West Virginia is where DuPont used and tortiously released C8 into the environment for decades, directly resulting in the current injuries at issue. West Virginia is where DuPont owned and operated the manufacturing plant at issue that caused all the damage, where the conduct causing the injuries occurred, and where the parties' binding contractual relationship governing these claims was created (and is still being implemented/enforced).
(Pls' Supp. Brief at 11; ECF No. 2285.)
The plaintiffs additionally contend that federal courts following the Restatement approach and weighing the various factors are free to find, for example, that the state where a dangerous material was manufactured has the "most significant relationship" to the occurrence and the parties for purposes of resolving various tort claims, even if the exposure to that chemical or the resultant injury is alleged to have occurred in a different state. Id. at 10 (citing as the example, In re Bendectin , 857 F.2d 290, 304-05 (6th Cir. 1988) ("We ... see the law of the state of manufacture of the product as being more significant in this type of case than that of the state where an individual plaintiff happens to live.") ).
On the other hand, DuPont maintains that it is not domiciled in West Virginia, a number of the claims filed by the plaintiffs allege conduct that relate to conduct that occurred in Delaware, DuPont's "home state," four of the six water districts that supplied the water at issue in this MDL are located in Ohio, and numerous plaintiffs testified that they did not know of the existence of the Leach Case, so could not have any justified expectations about which state's law would be applied to their claims. DuPont concludes that:
[F]or plaintiffs allegedly exposed to [C-8] in either Ohio or West Virginia, these [Restatement] factors do not overcome the presumption that the law of the state where that plaintiff's alleged exposure occurred should control. Specifically, for most plaintiffs, the state in which the alleged exposure to [C-8] occurred is the same state where the plaintiff resides. Further, even assuming, arguendo , that DuPont's claimed negligent conduct occurred in West Virginia or Delaware [Du Pont's state of incorporation], this fact alone does not trump the presumption that the law of the place of injury should control. See, e.g., Bramberger v. Toledo Hosp. , 897 F.Supp.2d 587, 596 (N.D. Ohio 2012) (finding under Ohio choice-of-law rules that the law of Michigan, where the alleged injury occurred, should apply even assuming that negligent conduct occurred in Ohio); cf. Wahl v. GE [983 F.Supp.2d 937, 947], 2013 U.S. Dist. LEXIS 162320, at *27 (M.D. Tenn. Nov. 14, 2013) ("It appears that the Sixth Circuit, courts within this circuit, and courts in other circuits addressing analogous circumstances, have uniformly concluded that the law of the plaintiffs place of injury applies, particularly where the place of injury is the same as the plaintiff's domicile.")
(DuPont's Supp. Brief at 4; ECF No. 2284.) The Court finds DuPont's arguments well taken.
Taken collectively and in context, the Restatement factors on balance favor the application of Ohio substantive law to the Ohio Plaintiffs for the reasons stated by DuPont and these additional reasons.
*1034 First, the Comments to the Restatement provide guidance, stating that "[w]hen conduct and injury occur in different states ... the local law of the state of injury will usually be applied to determine most issues involving the tort." 1 Restatement (Second) of Conflict of Laws , § 146 cmt. e.
Second, as DuPont correctly points out, Ohio's seminal choice-of-law decision, Morgan v. Biro Mfg. Co, supra , informs this Court with facts similar to those in this MDL. In Morgan , the plaintiff was a resident of Kentucky, who was injured by the defendant's product in Kentucky and who filed suit in Ohio. The product was manufactured in Ohio by an Ohio corporation. The Morgan court affirmed application of Kentucky law to the plaintiff's claims, Finding that Kentucky, where the plaintiff lived and the injury occurred, had a materially greater interest to the plaintiff's claims than did Ohio, where the product was manufactured and the manufacturer did business.
Third, aside from In re Bendectin , which presented unique circumstances not present here, the Sixth Circuit and courts within this circuit addressing analogous circumstances, have uniformly concluded that the law of the plaintiff's place of injury applies, particularly where the place of injury is the same as the plaintiff's domicile. See e.g., Bramberger, supra ; Wahl supra ; Byers v. Lincoln Elec. Co. , 607 F.Supp.2d 840, 847 (N.D. Ohio 2009) (applying Texas substantive law in a tort action based on exposure to welding fumes because, although plaintiff had welding jobs in numerous states, "the vast majority of his welding jobs were in Texas"); Jones v. Brush Wellman, Inc. , No. 1:00 CV 0777, 2000 WL 33727733, at *4, 2000 U.S. Dist. LEXIS 21897, at *11 (N.D. Ohio Sept. 13, 2000) (determining under Ohio choice-of-law rules that the law of the place of alleged toxic exposure to beryllium, Tennessee, governed and Ohio's interest in the litigation was not "sufficient to overcome that presumption").
As for In re Bendectin , the only case cited by the plaintiffs to support their position, the Sixth Circuit utilized Ohio's choice-of-law analysis. In re Bendectin was an MDL case that was brought by children with birth defects who alleged their mothers' use of the morning sickness drug Bendectin caused their conditions. The court gave overriding weight to the factor of where the Bendectin was manufactured, which was Ohio, and applied Ohio substantive law. The court viewed "the law of the state of manufacture of the product as being more significant in this type of case than that of the state where an individual plaintiff happens to live." In re Bendectin , 857 F.2d at 305. The Northern District of Ohio recently discussed the unique circumstances before the In re Bendectin court, in a decision that is on point and persuasive:
That the Bendectin court found the place of product manufacture decisive in its choice-of-law analysis, however, does not persuade this Court that the same result should apply in this case. First, as noted above, the Bendectin court's deliberation gave no weight to the rebuttable presumption as required under Ohio law, because the place of plaintiff's injury was "often unknown." The facts in this case are different-Byers knows where he was exposed to defendants' products, so the rebuttable presumption applies. Second, it is notable that no other court in this Circuit has ever followed the Bendectin choice-of-law analysis in a products liability action. Indeed, in another MDL proceeding, the Sixth Circuit Court of Appeals later rejected the conclusion that the law of the state of product manufacture should apply.
Byers v. Lincoln Elec. Co. , 607 F.Supp.2d 840, 849 (N.D. Ohio 2009) (citing *1035 In re American Medical Systems , 75 F.3d 1069 (6th Cir. 1996) (reversing certification of a nationwide medical device defect case because, among other reasons, the trial court failed to consider that the putative class members' claims would be governed by the laws of their home states-not the state of product manufacture-which would vary substantially); In re Telectronics Pacing Sys., Inc. , 172 F.R.D. 271, 291 n. 13 (S.D. Ohio 1997) (declining to apply the law of the state of product manufacture, and stating of the Bendectin analysis: "[this court] question[s] the correctness of that ruling and further question[s] the continuing validity of that holding in light of the Sixth Circuit's later ruling in In re American Medical Systems "); Bowling v. Pfizer, Inc. , 143 F.R.D. 141, 163 (S.D. Ohio 1992) (concluding the Bendectin ruling was limited to its facts); Jones v. Brush Wellman, Inc. , No. 1:00 CV 0777, 2000 WL 33727733, at *5 (N.D. Ohio Sept. 13, 2000) (concluding the Bendectin analysis did not apply because plaintiffs knew where they were exposed to the defendants' products) ).
As in Byers , this Court is not persuaded that the result from In re Bendectin should apply. The facts before this Court are different. The plaintiffs know where they were exposed to C-8, so the rebuttable presumption that the law of the place of injury applies. The rebuttable presumption is not overcome in this case for the reasons just stated above. The additional consideration of the § 6 factors does not change this conclusion. The Court finds particularly relevant the § 6 factors of certainty, predictability and uniformity of result, which weigh heavily in favor of application of the law of the place of injury. Applying the law of the place of injury will provide a predictable and uniform way to provide for the residents of each state. Otherwise, some of the Ohio Plaintiffs (i.e. , the plaintiffs who live in Ohio and were injured in Ohio), would have Ohio law applied to them and some would have West Virginia law applied. This is because, as explained above, the Ohio Plaintiffs who filed their claims in West Virginia will have Ohio law applied to their personal injury claims. But if those same Ohio Plaintiffs had filed their cases in Ohio, then West Virginia law would apply. Indeed, finding that the Ohio presumption in favor of application of the law of the place of injury is overcome would require the Court to carve out one group of plaintiffs from this MDL for different treatment based on where they chose to file their case. Choice of forum, however, is not one of the Restatement factors this Court is required to consider to determine the state that has "the most significant relationship to the occurrence" that forms the basis of the claim. See 1 Restatement (Second) of Conflict of Laws §§ 145, 146.
3. Conclusion - Choice of Law
Based on the foregoing, the Court concludes that regardless of where the case was filed, the West Virginia Plaintiffs (i.e. , the plaintiffs who live in and were injured in West Virginia) will have West Virginia law applied to their claims and the Ohio Plaintiffs (i.e. , the plaintiffs who live in and were injured in Ohio) will be subject to Ohio law. However, as the Court explained supra , determination of whether Ohio's damages caps can be applied does not answer the question of whether the caps will be applied. That issue is not yet ripe.
As noted supra , at page 12, the Ohio tort reform statute does not apply retroactively. The application of the damage limitations hinges on the accrual date of the Ohio Plaintiffs' injury. If such date occurred prior to April 7, 2005, the effective date of the statute, the caps do not apply. The parties have not been directed to brief the question of when claims in this case actually accrued. This issue will be resolved *1036 after each party has had an opportunity to be heard.
III.
For the reasons set forth above, the Court DENIES Plaintiffs' First Motion for Summary Judgment as it relates to its request that West Virginia law be applied to all of the individual cases within this MDL. (ECF No. 820.)
IT IS SO ORDERED.

The Leach Settlement Agreement also contains an entirety clause, which provides:
Entire Agreement. This Agreement contains the entire agreement among the Settling Parties relating to this Settlement. It specifically supersedes any settlement terms or settlement agreements relating to the Settlement that were previously executed by any of the Settling Parties.
(SA 14.12.)

The same is true for punitive damages claims in wrongful death actions. See Roginski v. Shelly Co. , 31 N.E.3d 724 (Ohio Com. Pl. 2014)judgment entered sub nom. Roginski v. The Shelly Co., 2014 WL 7007513 (Ohio Com. Pl. Aug. 21, 2014) (holding that wrongful death claim was not a tort claim within meaning of the statute capping punitive damages).