# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**J.A. STREET & ASSOCIATES, INC.,**
**Defendant and Third-Party Plaintiff Below, Petitioner,**

**vs) No. 17-0079** (Cabell County 08-C-623)

**BITCO GENERAL INSURANCE CORPORATION,**
**Plaintiff Below, Respondent and Cross-Petitioner,**

**and**

**LIBERTY MUTUAL AGENCY MARKETS (NOW**
**THE OHIO CASUALTY INSURANCE COMPANY),**
**ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS,**
**SCOTTSDALE INSURANCE COMPANY, and**
**THE CINCINNATI INSURANCE COMPANY,**
**Third-Party Defendants below, Respondents and Cross-Petitioners,**

**and**

**THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY,**
**Third-Party Defendant below, Respondent.**

**FILED**

**May 1, 2019**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

The petitioner, J.A. Street & Associates, Inc. ("Street"), appeals from six separate summary judgment orders entered by the Circuit Court of Cabell County on December 30, 2016, in a declaratory judgment action regarding insurance coverage.[1] Concluding that there was no duty to defend or indemnify Street, the circuit court granted summary judgment to each of the six respondent insurance companies: Bitco General Insurance Corporation (formerly Bituminous Casualty Corporation, referred to herein as "Bitco"); The Ohio Casualty Insurance Company (formerly Liberty Mutual Agency, referred to herein as "Ohio Casualty"); Zurich American Insurance Company of Illinois ("Zurich"); Scottsdale Insurance Company ("Scottsdale"); The Princeton Excess and Surplus Lines Insurance Company ("Princeton"); and The Cincinnati

---

[1] Street is represented by lawyers S. Douglas Adkins, Donald Capparella, and Elizabeth Sitgreaves.

Insurance Company ("Cincinnati").[2] The respondents argue in support of the circuit court's orders. Furthermore, respondents Bitco, Ohio Casualty, Zurich, Scottsdale, and Cincinnati assert cross-assignments of error contending there are additional grounds, not relied upon by the circuit court, that also support summary judgment in their favor.[3]

The parties' assignments of error pertain to whether policies of commercial general liability ("CGL") insurance, as well as policies that were written as umbrella and excess coverage to the CGL insurance, apply to breach of contract claims brought by a commercial property developer against its general contractor. Having considered the parties' written and oral arguments, we conclude that under the applicable and existing Tennessee law, the respondent insurance companies are entitled to summary judgment. Accordingly, we affirm. Furthermore, we find that this matter is appropriate for disposition in a memorandum decision pursuant to Rule 21 of the Rules of Appellate Procedure.

## I. Facts and Procedural Background

Petitioner Street is a construction company headquartered in Tennessee that served as the general contractor on a seventy-eight acre commercial shopping center development in Cabell County, West Virginia, named Merritt Creek Farm. Street and its subcontractors performed work at Merritt Creek Farm pursuant to written construction contracts that Street entered into with the property's developer, Thundering Herd Development, L.L.C. ("Thundering Herd"). Thundering Herd has sued Street asserting that it breached the construction contracts, and Street seeks a defense and coverage from the respondent insurance companies pursuant to insurance policies that Street purchased in Tennessee. The instant appeal concerns whether the insurance policies provide coverage. However, to understand the coverage dispute, it is necessary to first examine the underlying breach of contract lawsuit.

### A. Lawsuit over Merritt Creek Farm

On June 5, 2001, Thundering Herd entered into four written contracts with Street to hire Street as the general contractor for the Merritt Creek Farm development. In those contracts, Street agreed to, *inter alia*, oversee the site preparation for the development and oversee the construction of many of the buildings.[4] The written agreements provide that Street "covenants . . . that all the Work shall be performed in a good and workmanlike manner[,]" and that Street "shall provide competent supervision of all phases of the Work and shall cause the Work to be performed with a

---

[2] Bitco is represented by lawyers Avrum Levicoff and Edward I. Levicoff. Ohio Casualty is represented by W. Henry Jernigan Jr., Arie M. Spitz, and Elizabeth M. Shaffer. Zurich is represented by Tiffany R. Durst and Nathanial D. Griffith. Scottsdale is represented by Michael S. Saltzman, Debra Tedeschi Varner, and Jeffery D. Van Volkenburg. Cincinnati is represented by Adam M. Barnes. Princeton is represented by Daniel R. Bentz and Sarah C. Boehme.

[3] Although five of the six respondents are also cross-petitioners, we refer to them simply as "respondents" for ease of discussion.

[4] Some structures at Merritt Creek Farm were to be built by other contractors.

high degree of expertise and workmanship, so as to provide Owner with Improvements constructed for the general and specific uses to which the Improvements will be put."

Sometime prior to the events described herein, Thundering Herd retained an engineering firm, S&ME, Inc., which conducted geotechnical exploration and provided advice regarding land preparation for the Merritt Creek Farm site. Thundering Herd also reached an agreement with the Target Corporation for a parcel of land and "pad" to be prepared at Merritt Creek Farm, after which this parcel would be conveyed to the Target Corporation for Target to construct a store on the pad.

Street hired subcontractors to prepare the site, including to grade the land and install fill material. In early September 2001, Street's subcontractors completed the site preparation and pad for the planned Target store. On or about September 21, 2001, a slope that was constructed at the rear of the proposed Target site failed, causing a landslide, damage to the pad, and damage to adjacent property owned by a third party. As a result, Thundering Herd reportedly incurred $721,875.18 in additional costs to repair this slope, reconstruct the Target site, and compensate the neighbor for the damage to the adjacent property.[5] Street oversaw these repairs.

In September 2001, subcontractors hired by Street began site preparation and fill placement in a different area in the Merritt Creek Farm development known as "Shops A." Construction of the pad for Shops A was finished on January 9, 2002. Construction of the foundation of Shops A began on March 12, 2002, and the building itself was substantially completed in June 2002. In the fall of 2002, the walls at Shops A began cracking due to settlement. In a report dated February 24, 2003, S&ME discussed the problems at Shops A and made recommendations for corrective action. As a result, remedial action was taken during the fall of 2003; Street arranged for the installation of pilings under the foundation and grout injection under the slab, as well as repairs of damage to the building.

Because of the land movement and resulting damage at Merritt Creek Farm, in June 2003 Thundering Herd filed suit against S&ME in the Circuit Court of Cabell County asserting claims of negligence, breach of contract, breach of warranty, and indemnity.

Construction of much of the Merritt Creek Farm shopping center was completed in 2004.[6] On December 5, 2005, an attorney representing Thundering Herd wrote a letter to Street advising of slope movement and resulting damage to improvements in another section of Merritt Creek Farm referred to as "Shops C," which includes an A.C. Moore and other stores. Construction of

---

[5] Target used a different construction company to build its store building. In separate litigation, Target sued Thundering Herd in federal court alleging that in June 2002, its building was damaged by land movement. Street was subsequently added as a fourth-party defendant in that litigation. The parties report that the lawsuit was settled in 2008 with CGL carrier Bitco contributing $450,000 on Street's behalf. According to one of Bitco's interrogatory answers, this payment was made pursuant to Bitco's March 2002 to March 2003 policy period. A subsequent CGL carrier, Cincinnati, also contributed to the settlement.

[6] The parties advise that additional construction began in 2012 or 2013 on a building to house a Petco store.

3

Shops C had been completed in December 2002. Street and its subcontractors had not constructed the A.C. Moore building, but they performed the site preparation. The December 2005 letter notified Street that it might be responsible for the cost to repair Shops C. Subsequently, on February 22, 2007, a company named Bizzak, Inc. advised Street of land settlement at yet another part of the shopping center referred to as the "Office Depot Site."

On December 11, 2007, Thundering Herd[7] amended its complaint to add Street as an additional defendant (referred to herein as the "Amended Complaint"). Thundering Herd alleged that Street failed to comply with its obligations in the construction contracts, resulting in harm to the Merritt Creek Farm development from landslides, sloughing, land movement, and settling. In addition to seeking damages for the Target site and Shops A, with its Amended Complaint Thundering Herd also sought compensation for damages to the A.C. Moore store area, the Office Depot store area, and to storm and sanitary systems throughout the development.

It is notable that all four of Thundering Herd's claims against Street in the Amended Complaint are based entirely upon the construction contracts they signed. Indeed, the circuit court concluded that the statute of limitations for bringing tort claims had already expired when Thundering Herd added Street as a defendant. Thundering Herd's first cause of action against Street is labeled "Breach of Contract, Target Store Area[.]" In this count, Thundering Herd alleges that "[p]ursuant to the written agreement between" Thundering Herd and Street, "Street had the obligation to discharge its responsibilities under the agreement in a competent manner" but "[a]cting individually and by and through its subcontractors, J.A. Street failed to comply with the requirements of the written agreement, thereby resulting in a breach of the terms of said agreement." The Amended Complaint goes on to provide that "[a]s a direct and proximate result of the breach of the agreement, [Thundering Herd] has suffered damages from the land movement and slide that occurred on the Target store site" and "Street is liable to [Thundering Herd] for the damages incurred as a result of the breach of the agreement."

Thundering Herd's second cause of action against Street is titled "Breach of Contract, Remainder of Development[.]" For this claim, Thundering Herd alleges that "[p]ursuant to the written agreements between" them, "Street had the obligation to discharge its responsibilities under the agreements in a competent manner" but "[a]cting individually and by and through its subcontractors, J.A. Street failed to comply with the requirements of the written agreements, thereby resulting in a breach of the terms of said agreements." The Amended Complaint further provides that "[a]s a direct and proximate result of the breach of the agreements," Thundering Herd has "suffered substantial damages to various areas of the site" and "Street is liable to [Thundering Herd] . . . for the damages incurred as a result of the breach of the agreement." The harm to the site is identified as "unanticipated land movement and settlement, sloughing and slides."

---

[7]A company named THD Investors 7, LLC, acquired one tract in the Merritt Creek Farm Development in December 2003. Thundering Herd reports that it has assigned certain rights with respect to the underlying litigation to THD Investors 7. Although Thundering Herd and THD Investors 7 are co-plaintiffs, for convenience they are collectively referred to herein as "Thundering Herd."

4

The third cause of action against Street is labeled "Breach of Warranty." In this count, Thundering Herd asserts that it was damaged by Street's breach of warranties arising from their written contracts. More specifically, the Amended Complaint provides that "[t]he agreements between" them "expressly provide that [Street] warrants its workmanship as to the services to be performed" and that "[i]n performing the requirements of the agreements, J.A. Street breached its express warranty with respect to the work performed on both the Target store site and the remainder of the Merritt Creek Farm site, which resulted in the damages alleged herein." Additionally, Thundering Herd alleges that "[a]s a result of the agreements between" it and Street, "there existed an implied warranty on the part of J.A. Street that it would perform its obligation in a manner consistent with the level of skill reasonably required for the business in which J.A. Street is engaged."

In its fourth and final count against Street, Thundering Herd seeks indemnity for expenditures it has made, or will make, to repair the slopes and other property at the development that were allegedly damaged as a result of Street's actions. As a basis for this claim, Thundering Herd contends that "[p]ursuant to the written agreement between [Thundering Herd] and J.A. Street, J.A. Street has agreed both expressly and by implication, that it will indemnify [Thundering Herd] for any losses or damages payable by [Thundering Herd] that result from the negligence or wrongful acts of J.A. Street and/or its subcontractors." This count of the Amended Complaint also provides that "[p]ursuant to the covenants of express and implied indemnity arising out of the written agreement between [Thundering Herd] and J.A. Street, J.A. Street is liable to [Thundering Herd] for the amounts paid as set forth herein."

On January 13, 2008, Street answered the Amended Complaint, filed a cross-claim against SM&E, and filed a counterclaim against Thundering Herd. In its petitioner's brief to this Court, Street reports that the Thundering Herd litigation is pending and that Thundering Herd asserts the land movement problems at Merritt Creek Farm are ongoing and progressive.

**B. This Insurance Litigation**

Between March 2001 and March 2015, Street was insured by the following CGL policies, and by umbrella and excess policies related to the CGL coverage, from the respondent insurance companies:

| 3/1/01-3/1/02 | Bitco CGL $1,000,000 |
| | Ohio Casualty Umbrella/Excess $5,000,000 |
| 3/1/02-3/1/03 | Bitco CGL $1,000,000 |
| | Zurich Umbrella/Excess $5,000,000 |
| 3/1/03-3/1/04 | Bitco CGL $1,000,000 |
| | Bitco Umbrella/Excess $2,000,000 |
| 3/31/03-3/1/04 | Scottsdale Excess $2,000,000 |
| 3/1/04-3/1/05 | Bitco CGL $1,000,000 |
| | Bitco Umbrella/Excess $2,000,000 |
| | Scottsdale Excess $2,000,000 |
| 3/1/05-3/1/06 | Bitco CGL $1,000,000 |
| | Bitco Umbrella/Excess $2,000,000 |

5

Princeton Excess $2,000,000

3/1/06-3/1/07      Bitco CGL $1,000,000

      Bitco Umbrella/Excess $5,000,000

3/1/07-3/1/09      Cincinnati CGL $1,000,000

      Cincinnati Umbrella $5,000,000

3/1/09-3/1/12      Cincinnati CGL $1,000,000

      Cincinnati Umbrella $5,000,000

3/1/12-3/01/15      Cincinnati CGL $1,000,000

      Cincinnati Umbrella $5,000,000

Street, which is a Tennessee company, purchased all of these policies in Tennessee using a Tennessee insurance agent.

Bitco has been providing a defense to Street in the Thundering Herd litigation. However, on July 14, 2008, Bitco filed the instant declaratory judgment action asking the circuit court to declare that it owes no duties to either defend or indemnify Street in this matter. Thereafter, Street was permitted to file an amended answer and counterclaim in the declaratory judgment action to bring all of the CGL policies that Bitco had issued to Street from March 2001 to March 2007 within the circuit court's consideration. Furthermore, on March 13, 2014, Street filed a third-party complaint seeking a declaratory judgment as to the potential coverage of all of its insurers who issued CGL policies from 2007 to 2015, and of all the insurers who issued excess and umbrella policies from 2001 to 2015. More than two years of litigation in circuit court followed, including multiple motions and cross-motions for summary judgment.

When arguing to the circuit court that they were entitled to summary judgment, the insurance companies asserted that there is no coverage under any of their policies because Thundering Herd's contract-based claims against Street do not constitute "property damage" caused by an "occurrence," as required by the insuring agreement portion of each policy. They further argued that even if there was "property damage" caused by an "occurrence," that one or more other policy provisions and/or exclusions would apply to preclude coverage. Arguments presented to the circuit court by some or all of the respondents included application of their contractual liability exclusions; application of their business risk exclusions; application of their subsidence exclusions; application of their "known loss" exclusions and the related common-law "loss in progress" doctrine; that the damages occurred prior to or after their coverage periods; that Street failed to timely notify them of the risk and of the Thundering Herd lawsuit; that even if there is coverage and no applicable exclusion, there was only a single, ongoing occurrence subject to a single policy limit; and that all of the underlying CGL policies must be exhausted before any of the umbrella/excess policies apply.

In its six separate summary judgment orders, the circuit court concluded that some of Thundering Herd's contract claims against Street might amount to an "occurrence" resulting in "property damage" under the insuring agreement provisions of the respondents' policies. Nonetheless, the circuit court found that other policy provisions, primarily the contractual liability exclusion, preclude coverage in this matter. Because the circuit court found no coverage pursuant to the CGL policies, it consequently found no coverage under the related umbrella and excess policies. Accordingly, the circuit court ruled that the respondent insurance companies owed neither

6

a duty to defend nor a duty to indemnify Street with respect to Thundering Herd's Amended Complaint, and granted summary judgment in the respondents' favor. It is from these six summary judgment orders that Street appeals and five of the respondent insurance companies file cross appeals.

## II. Choice of Law and Standard of Review

The overall question presented in this declaratory judgment proceeding is whether the claims asserted against Street in the Amended Complaint are within the risk covered by the various insurance policies. Street is a Tennessee company with its principal offices in Tennessee, and all of these insurance contracts were formed and delivered in Tennessee. Accordingly, the parties agree that Tennessee law controls the substantive legal rulings in this case. *See* Syl., *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 182 W.Va. 580, 390 S.E.2d 565 (1990) ("In a case involving the interpretation of an insurance policy, made in one state to be performed in another, the law of the state of the formation of the contract shall govern, unless another state has a more significant relationship to the transaction and the parties, or the law of the other state is contrary to the public policy of this state.").

Nonetheless, West Virginia law controls our procedures. *See* Syl., in part, *State ex rel. Airsquid Ventures, Inc. v. Hummel*, 236 W.Va. 142, 778 S.E.2d 591 (2015) ("The procedural laws of this state necessarily apply to matters that are brought in the courts of West Virginia."). The circuit court resolved this case on summary judgment pursuant to Rule 56 of the West Virginia Rules of Civil Procedure. It is well-settled in our state that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

As to this Court's standard of review on appeal, "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). In that same vein, "[a] circuit court's entry of a declaratory judgment is reviewed *de novo*." Syl. Pt. 3, *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995). Moreover, "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement, shall be reviewed *de novo* on appeal." Syl. Pt. 2, *Riffe v. Home Finders Assoc., Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999). Using this plenary standard of review, we turn to the parties' arguments.

## III. Discussion

The parties assert a total of twenty-three separate assignments of error on appeal and cross appeal. The assignments of error present issues regarding the duty to defend and/or the duty to indemnify an insured pursuant to CGL insurance policies. In Tennessee, the duty to defend is broader than the duty to indemnify. *St. Paul Fire & Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831, 835 (Tenn. 1994). An insurance company's duty to defend its insured is triggered "when the underlying complaint alleges damages that are within the risk covered by the insurance contract and for which there is a potential basis for recovery." *Travelers Indem. Co. of Amer. v. Moore & Assoc., Inc.*, 216 S.W.3d 302, 305 (Tenn. 2007) (citing *Torpoco*, 879 S.W.2d at 835). Whether a

duty to defend exists "depends solely on the allegations contained in the underlying complaint." *Travelers*, 216 S.W.3d at 305.[8] In Tennessee,

> [f]or the duty to defend to arise, the underlying complaint must make sufficient allegations concerning the nature of the damages sought to trigger the duty to defend, or, keeping in mind that ambiguity is construed in favor of the insured, to alert . . . [the insurer] to further inquire if the allegations are not clear. This means that . . . [the insurer] must have received enough information from the allegations to understand that there had been an "occurrence" causing "property damage" and that no exclusions applied.

*Forrest Const., Inc. v. Cincinnati Ins. Co.*, 703 F.3d 359, 363 (6th Cir. 2013) (applying Tennessee law). Any doubt as to whether a complaint states a cause of action within the policy's coverage is resolved in favor of the insured. *Dempster Bros., Inc. v. U.S. Fid. & Guar. Co.*, 388 S.W.2d 153, 156 (Tenn. Ct. App. 1964). Moreover, if any of the allegations are covered by the policy, the insurer must defend the lawsuit regardless of the number of allegations outside of coverage. *Drexel Chem. Co. v. Bituminous Ins. Co.*, 933 S.W.2d 471, 480 (Tenn. Ct. App. 1996).

Tennessee courts have explained that CGL policies are "designed to protect an insured against certain losses arising out of business operations." *Travelers*, 216 S.W.3d at 305 (citation omitted). CGL policies "are divided into several components, including the 'insuring agreement,' which 'sets the outer limits of an insurer's contractual liability,' and the 'exclusions,' which 'help define the shape and scope of coverage' by excluding certain forms of coverage." *Id.* (quoting *Standard Fire Ins. Co. v. Chester-O'Donley & Assoc., Inc.*, 972 S.E.2d 1, 7 (Tenn. Ct. App. 1998)). When considering what coverage is provided by a CGL policy, "the 'insuring agreement' should be construed before the 'exclusions' to avoid confusion and error." *Travelers*, 216 S.W.3d at 306. Finally, the interpretation of insurance contracts is governed by the same rules of construction used to interpret any contract. *Id.* at 305. With these precepts in mind, we examine the arguments pertaining to the policies of each of the six respondent insurance companies.

### A. Bitco

Bitco was Street's CGL insurer for six policy years beginning on March 1, 2001 and ending on March 1, 2007. Bitco also provided umbrella/excess coverage for four policy years from March 1, 2003, until March 1, 2007. Because these years encompass the construction of the Merritt Creek

---

[8] *Accord Clark v. Sputnick's, LLC*, 368 S.W.3d 431, 439 (Tenn. 2012) ("An insurer's duty to defend is determined solely by an examination of the allegations of the underlying complaint."); *Torpoco*, 879 S.W.2d at 835 (same). In its first assignment of error, Street contends that genuine issues of material fact exist to preclude summary judgment. Specifically, Street contends that there are outstanding factual questions regarding the extent of the damage to the Merritt Creek Farm property, when the property damage occurred, and whether it is ongoing. However, for purposes of our analysis, none of these factual issues are material to the question of whether Thundering Herd's Amended Complaint asserts allegations that would trigger coverage under the various insurance policies. We need only look to the Amended Complaint and the policy language.

Farm development, and because land movement problems at the development were reported to Street during those years, we will address Bitco's policies first.

The circuit court granted summary judgment in favor of Bitco on the basis of two policy exclusions: the contractual liability exclusion, and the business risk "exclusion M." Street challenges these rulings on appeal arguing that pursuant to the modern legal view, a CGL policy can apply to faulty construction situations. Bitco contends that under long-standing Tennessee law, CGL insurance simply does not apply to the breach of construction contract claims that Thundering Herd asserts against Street in the Amended Complaint, and it was unnecessary for the circuit court to have applied the policy exclusions. Alternatively, Bitco argues that various policy exclusions operate to bar coverage. As directed by Tennessee law, we begin our analysis with the insuring agreement portion of Bitco's CGL policy and then turn to the policy exclusions. *See Travelers*, 216 S.W.3d at 306.

### i. Bitco's CGL Insuring Agreement

Bitco used the same CGL policy form, a standard form in the insurance industry, for each of the six years it provided this coverage to Street. The insuring agreement portion of the policy provides, *inter alia*, that Bitco

> will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damages" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damages" to which this insurance does not apply. . . .

The policy defines "property damage" to include "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it[.]" Furthermore, Bitco's CGL insurance applies only if "the 'bodily injury' or 'property damage' is caused by an 'occurrence'. . . ." The policy defines "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions." The word "accident" is undefined in the policy.

Street argues that it is entitled to coverage and a defense pursuant to the Tennessee Supreme Court's 2007 opinion in *Travelers*, 216 S.W.3d 302. In that case, a property owner sought compensation from a general contractor for damages that resulted from a subcontractor's negligent installation of windows during the construction of a hotel. *Id.* at 304. The property owner brought tort claims alleging that the negligent window installation allowed moisture to penetrate into the hotel rooms, causing water damage and mold growth inside the building. *Id.* When deciding whether the general contractor's CGL policy provided coverage, the Tennessee Supreme Court began by analyzing the terms "occurrence" and "property damage" in a CGL insuring agreement.

Like the Bitco CGL policy, the policy at issue in *Travelers* defined "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 308. The Tennessee Supreme Court determined that "'accident' refers to 'an

9

event not reasonably to be foreseen, unexpected and fortuitous'" and would "include the 'negligent acts of the insured causing damage which is undesigned and unexpected.'" *Id.* at 308 (quoting *Gassway v. Travelers Ins. Co.*, 439 S.W.2d 605, 607 & 608 (1969)). The court reasoned that because a person would assume that a subcontractor would properly install windows, then the water penetration alleged in *Travelers* was not a foreseen event and could constitute an "occurrence" under the policy. *Travelers*, 216 S.W.3d at 308-09.

Turning to the issue of "property damage," the policy at issue in *Travelers* contained the same definition that is in Bitco's policy: "Property damage" is "[p]hysical injury to tangible property, including all resulting loss of use of that property." *Id.* at 306, 309. Importantly, in its discussion of "property damage," the *Travelers* court was very careful to differentiate a contractor's faulty workmanship from any damage that *resulted from* that faulty workmanship. The court quoted a California case that it found instructive:

> We do not think that the mere inclusion of a defective component, where no physical harm to the other parts results therefrom, constitutes "property damage" within the meaning of the policy. For example, if an automobile crash results from the failure of its defective tire, the defective component can be said to have caused "property damage" to the finished product. If, however, some of the tires purchased by the automobile manufacturer are found to be defective and the manufacturer therefore withdraws its cars from the market, there has not been "injury to or destruction of tangible property[.]"

*Id.* at 309-10 (quoting *St. Paul Fire & Marine Ins. Co. v. Coss*, 145 Cal.Rptr. 836, 839 (Cal.Ct.App. 1978)) (internal citation omitted). According to the Tennessee Supreme Court, "[t]his passage makes clear that a 'claim limited to faulty workmanship or materials' is one in which the sole damages are for replacement of a defective component or correction of faulty installation." *Travelers*, 216 S.W.3d at 310. Using this reasoning, the court concluded that if the hotel owner had merely alleged that the windows were installed defectively, without more, this alleged defect would not constitute covered "property damage" under a CGL policy. *Id.* at 310. However, because the hotel owner alleged that the defective installation resulted in water penetration causing moisture and mold damage to the building, the court concluded that "property damage" for purposes of the CGL policy was alleged. *Id.*[9] The court explained that "the alleged water

---

[9] This conclusion is in accord with other cases decided under Tennessee law. *See Forrest Const.*, 703 F.3d at 366 (applying Tennessee law to conclude that "property damage" was sufficiently alleged to invoke CGL coverage where contractor's construction of faulty foundation in house caused damage elsewhere in dwelling); *Cincinnati Ins. Co. v. Grand Pointe, LLC*, Nos. 105-CV-161 & -157, 2007 WL 1585542, at *5-6 (Dist. E.D. Tenn. May 30, 2007) (acknowledging that under Tennessee law, damage solely to a contractor's own work product does not fall within definition of "property damage"); *Standard Const. Co., Inc. v. Maryland Cas. Co.*, No. 01-2006V, 2002 WL 1477886, at *9 (Dist. W.D. Tenn. May 15, 2002) (recognizing that under Tennessee law, faulty performance of work bargained for in contract would not constitute covered "property damage"); *accord Chester-O'Donley & Assoc.*, 972 S.W.2d at 13 (Tennessee court applying Kentucky law to conclude that CGL insurer must provide defense only with regard to claims based

penetration is analogous to the automobile accident that is caused by the faulty tire." *Id.* Because the Tennessee Supreme Court also found no applicable policy exclusions,[10] it ruled that the CGL provider owed a duty to defend the general contractor for claims asserted by the hotel.

Relying on *Travelers*, Street argues that it is entitled to coverage and a defense because "Thundering Herd is not seeking damages for the cost of correcting the fill material but instead is seeking damages to buildings and other structures on the site allegedly caused by the defective fill." A review of Thundering Herd's Amended Complaint demonstrates that this representation is not completely accurate. For example, a portion of Thundering Herd's Amended Complaint seeks reimbursement for money spent repairing the failed slope on the Target lot.[11] However, the installation of fill material, the grading of the land, the construction of slopes, and other site preparation work *are the instances of allegedly faulty workmanship and materials* in this particular matter. As such, the correction of this site preparation work is not covered by Bitco's CGL policy.

Nonetheless, to the extent that Thundering Herd's first and second claims against Street also seek damages for other injury to property that *resulted* from this alleged faulty workmanship—such as cracked walls or floors in structures caused by the settling of improper fill material—we agree with Street that those claims may assert covered "property damage" pursuant to the *Travelers* analysis.[12] As the circuit court recognized when quoting a seminal New Jersey Supreme Court decision, "the policy in question does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident." *See Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 796 (N.J. 1979).

As explained above, even if some of Thundering Herd's claims fall within the definition of "property damage," that property damage must also have been caused by an "occurrence," i.e. an accident or unforeseen event, in order for there to be coverage. Notably, the property owner in *Travelers* was seeking tort damages for the water penetration and mold growth in its hotel.[13]

_____

on physical damage to portions of building that resulted from contractor's faulty work but were not within scope of contractor's work).

[10] The Tennessee Supreme Court considered, but under the particular facts of the case rejected, application of the "your work" exclusion. *Travelers*, 216 S.W.3d at 310.

[11] This slope failure and its repair occurred before construction began on any buildings.

[12] As noted in the recitation of facts, *supra*, Thundering Herd's first and second claims against Street essentially assert that Street's workmanship was deficient in violation of the construction agreements, and that this workmanship caused property damage. However, the third claim asserts that Street breached warranties under the contract, and the fourth claim seeks indemnification under the contract. Street fails to explain how breaching a contractual warranty or failing to indemnify the other party to a contract could result in covered "property damage." Nonetheless, because of our other rulings in this case, particularly the applicability of the contractual liability exclusion, we need not belabor this issue further.

[13] The hotel owner "filed a demand for arbitration alleging . . . *[p]oor and negligent* design, supervision, and implementation of the window installation, resulting in water and moisture

11

However, Thundering Herd's Amended Complaint does not assert any tort claims against Street. Thundering Herd's claims are based entirely upon alleged breaches of the contracts that delineated the scope and requirements for the construction of the Merritt Creek Farm development. Bitco asserts that "[w]ell-established Tennessee authority . . . [has] explicitly recognized that contract claims, precisely like those asserted against J.A. Street, are not within the embrace of the insuring agreement of the standard commercial liability policy." To support this assertion, Bitco relies upon Tennessee cases that pre-date *Travelers*, primarily the Tennessee Supreme Court decision in *Vernon Williams & Son Construction, Incorporated v. Continental Insurance Company*, 591 S.W.2d 760 (Tenn. 1979).

In *Vernon Williams*, a property owner asserted that its contractor breached their construction contract by not properly designing and building an addition to a warehouse. *Id.* at 761. The contractor sought coverage under its CGL policy. When discussing the policy's coverage and exclusions, the Supreme Court of Tennessee quoted a New Jersey case, which in turn quoted a law review article, regarding the risk intended to be covered by CGL insurance:

> "The risk intended to be insured [by a CGL policy] is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This lability, however, is not what the coverages in question are designed to protect against. The coverage is for *tort liability* for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." (Henderson, . . . ["Insurance Protection for Products Liability and Completed Operations What Every Lawyer Should Know"], 50 Neb. L. Rev. [415 ] at 441 [1971]).

*Vernon Williams*, 591 S.W.2d at 764 (quoting *Weedo*, 405 A.2d at 791) (emphasis added). The Tennessee Supreme Court concluded by saying that it was "convinced that the standard comprehensive general liability policy does not provide coverage to an insured-contractor for a breach of contract action grounded upon faulty workmanship or materials, where the damages claimed are the cost of correcting the work itself." *Vernon Williams*, 591 S.W.2d at 765. Because the claim in *Vernon Williams* was only for the cost of correcting deficient work, the Tennessee court found that that there was no CGL coverage and no duty to defend. *Id.*

In another pre-*Travelers* case, the Tennessee Court of Appeals relied on *Vernon Williams* to decide whether there was a covered "occurrence" in a breach of contract case. *See State Auto Ins. Co. v. Gordon Constr., Inc.*, No. M1999-00785-COA-R3-CV, 2001 WL 513884 (Tenn. Ct. App. May 15, 2001). In *State Auto*, a homeowner filed suit alleging that a contractor breached their construction contract, including breaching express and implied warranties under the contract, by

---

penetration, which in turn has caused" other harm to the hotel. *Travelers*, 216 S.W.3d at 304 (emphasis added).

failing to perform work on her home in a good and workmanlike manner. *Id*. at \*1. The court observed that the damages sought in the suit "flow purely from Gordon Construction's failure to perform its work according to the contract. . . . [The homeowner] alleges only that Gordon failed to do its work properly." *Id.* at \* 5. Because the plaintiff did "not allege injury to person or property arising out of" the contractor's work, the court concluded that the homeowner's breach of contract claims did not allege an "occurrence" and the CGL carrier owed no duty to defend the contractor. *Id.*

After reviewing these cases and *Travelers*, we conclude that *Vernon Williams* and its progeny are not determinative of the issue of whether there is coverage pursuant to the insuring agreement section of Bitco's CGL policy. The court in *Vernon Williams* did not say that there can *never* be "property damage" caused by an "occurrence" in a breach of construction contract situation. Rather, the court explained that there is no CGL coverage for "faulty workmanship or materials, where the damages claimed are the cost of correcting the work itself." *Vernon Williams*, 591 S.W.2d at 765. Similarly, the court in *State Auto* was careful to note that the plaintiff therein did "not allege injury to person or property arising out of" the faulty workmanship. 2001 WL 513884, at \*5. In the case *sub judice*, among its many claims, Thundering Herd's Amended Complaint does seek recovery for purported damages beyond the cost of correcting the allegedly faulty site preparation work.

Even more importantly, in *Travelers* the Tennessee Supreme Court took the opportunity to clarify its holding in *Vernon Williams* and to correct a misapprehension that had developed in cases decided in the wake of *Vernon Williams*. Specifically, the Tennessee high court explained that the holding in *Vernon Williams* had been based upon policy exclusions, not upon the insuring agreement's requirements for "property damage" caused by an "occurrence." The court clarified that "neither *Weedo* nor *Vernon Williams* is relevant to the determination of whether there has been an 'occurrence' under the terms of the 'insuring agreement[,]'" and that an incorrect reliance upon exclusions to determine the meaning of "occurrence" had resulted in "regrettably overbroad generalizations concerning CGLs" in prior cases. *Travelers*, 216 S.W.3d at 307 (citation omitted).[14] In light of this clarification in *Travelers*, we reject Bitco's argument that pursuant to Tennessee law, the strictly contractual claims asserted herein can *never* be covered by the insuring agreement portion of a standard CGL policy.

*Travelers* was a tort case, so it is not entirely clear whether Tennessee courts would conclude that a claim sounding entirely in breach of contract could allege damages covered by the insuring agreement of a standard CGL policy.[15] Regardless, even assuming *arguendo* that there is

---

[14] Nonetheless, the *Vernon Williams* line of cases remains authoritative, particularly on the issue of policy exclusions. *See infra*, section III.A.ii. of this opinion.

[15] In addition to multiple pre-*Travelers* cases from Tennessee, Bitco cites to legal commentary and cases from other jurisdictions to argue that a pure breach of contract claim does not constitute damage caused by an "occurrence." *See, e.g.*, 9A Couch on Insurance §129:5 (3d ed. 2018 update) (explaining that "[t]he majority of jurisdictions have held that breach of contract is not an occurrence" for CGL coverage); *Key Custom Homes, Inc. v. Mid-Continent Cas. Co.*, 450 F.Supp.2d 1311, 1317-18 (M.D. Fla. 2006) (applying Florida law) ("[I]t is equally clear that breach

some covered "property damage" caused by an "occurrence" alleged anywhere in Thundering Herd's Amended Complaint against Street, the insuring agreement section of a CGL policy only "sets the outer limits of an insurer's contractual liability." *Travelers*, 216 S.W.3d at 305 (quoting *Chester O'Donley & Assoc.*, 972 S.E.2d at 7). The policy's exclusions then "'help define the shape and scope of coverage' by excluding certain forms of coverage." *Id.* Thus, our analysis in this case turns to the exclusions—and Bitco's policy contains an exclusion for contractual liability that is directly on point.

### ii. Contractual Liability Exclusion to Bitco's CGL Policy

Each of Bitco's CGL policies contains a contractual liability exclusion providing that the insurance does not apply to

> "Bodily injury" or "property damage" for which the insured is obligated to pay damages *by reason of the assumption of liability in a contract or agreement*. This exclusion does not apply to liability for damages:
> (1) That the insured would have in the absence of the contract or agreement; or
> (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement[.]

(Emphasis added.) The circuit court found that the policy's contractual liability exclusion operates to exclude all coverage for Thundering Herd's claims against Street. After reviewing the allegations in Thundering Herd's Amended Complaint, we agree.[16]

A straight-forward reading of the Amended Complaint reveals that Thundering Herd is only seeking to have Street pay damages by reason of Street's alleged assumption of liability in

---

of contract claims for the recovery of money are not covered by general liability insurance policies."). We observe, however, that some jurisdictions do not draw the distinction of "contract versus tort" for a CGL insuring agreement. For example, the Supreme Court of North Dakota said that a CGL policy "does not insure the insured's work itself; rather, it insures consequential damages that stem from that work. As a result, a CGL policy may provide coverage for claims arising out of tort, *breaches of contract*, and statutory liabilities as long as the requisite accidental occurrence and property damage are present." *ACUITY v. Burd & Smith Const., Inc.*, 721 N.W.2d 33, 38 (N.D. 2006) (emphasis added) (citations omitted); *accord American Family Mut. Ins. Co. v. American Girl, Inc.*, 673 N.W.2d 65, 78 (Wis. 2004) (stating that if losses actionable in contract were never "occurrences" for purposes of insuring agreement, then business risk exclusions later in policy would be "entirely unnecessary"). It is the responsibility of the Tennessee courts, not our Court, to decide whether to draw this distinction for purposes of Tennessee law.

[16] *See, e.g., Travelers*, 216 S.W.3d at 305 (noting that duty to defend is broader than duty to indemnify, and whether duty to defend exists "depends solely on the allegations contained in the underlying complaint").

their construction contracts.[17] The first two causes of action assert that Street is liable because it breached the construction contracts by failing to perform work in a competent manner. The third cause of action asserts that Street's performance breached warranties that are expressed or implied in the contracts. The fourth cause of action asserts that Street is failing to comply with its obligation pursuant to the contracts to indemnify Thundering Herd for any losses. As the circuit court correctly recognized in its summary judgement order, since all of Thundering Herd's claims against Street are based upon the parties' contracts, and no tort claims are alleged, Street would not be liable for the alleged damages in the absence of the contracts. These claims fit squarely within the purview of the contractual liability exclusion.

The applicability of Bitco's contractual liability exclusion is reinforced by the pronouncement in both *Travelers* and *Vernon Williams* that CGL "coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained[.]" *Travelers*, 216 S.W.3d at 307 (citations omitted); *Vernon Williams*, 591 S.W.2d at 763-64 (citation omitted). This conclusion is also supported by the Tennessee Court of Appeals' explanation in another case that "[g]eneral liability policies are not 'all-risk' policies. . . . They provide an insured with indemnification for damages up to policy limits for which the insured becomes liable as a result of tort liability to a third party." *Chester-O'Donley & Assoc.*, 972 S.W.2d at 6 (citations omitted). Business risk exclusions in CGL policies "are based on the premise that general liability coverage is not intended as a guarantee of the insured's product or work . . . . Accordingly, general liability policies are not intended to cover the insured's contractual liability for economic loss because its work was not that for which the damaged person bargained." *Id*. at 7 (citations omitted).

A federal district court applying Tennessee law addressed this exclusion in *Trinity Universal Insurance Company v. Turner Funeral Home, Inc.*, No. 1:02-CV-231, -298, -083, 2003 WL 23218046 (E.D. Tenn. Dec. 12, 2003). In that case, plaintiffs asserted several claims against a funeral home for its failure to have their decedents' remains properly cremated. The claims included allegations that the funeral home breached contracts, and breached implied warranties in the contracts, for the failure to deliver appropriate cremation and cremation services and products. *Id.* at 8. The funeral home sought coverage under its CGL policy, but the district court easily concluded that these breach of contract claims were excluded by operation of the policy's contractual liability exclusion. *Id.* at 9.

We also find persuasive support in our decision *Silk v. Flat Top Construction, Inc.*, 192 W.Va. 522, 453 S.E.2d 356 (1994). In *Silk*, the plaintiffs entered into a written agreement with a contractor whereby the contractor agreed to serve as the supervisory consultant for the construction of a home. Later, the plaintiffs sued asserting that the contractor breached their agreement by not ensuring the home was built timely and in conformance with construction plans, and by not properly supervising the work and expenditures. The contractor sought coverage from its CGL insurer, which refused to defend or indemnify based upon, *inter alia*, a contractual liability exclusion identical to Bitco's exclusion: "This insurance does not apply to: . . . 'Bodily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption

---

[17] The circuit court found that Thundering Herd filed its claims against Street beyond the two-year statute of limitations for bringing a tort action.

of liability in a contract or agreement." *Id.* at 525, 453 S.E.2d at 359. Finding this policy language to be clear and unambiguous, our Court concluded that the CGL policy did not extend coverage for breach of contract. *Id.* Furthermore, although the plaintiffs in *Silk* tried to cast some of their counts as negligence claims, this Court recognized that the alleged damages had "their origin solely in contract" and thus those counts were also subject to the contractual liability exclusion. *Id.* at 526, 453 S.E.2d at 360. We explained that

> [t]ort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.

*Id.* at 526, 453 S.E.2d at 360 (quoting *City of Richmond, Va. v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 446 (4th Cir. 1990)) (internal citation and quotation marks omitted). Accordingly, our Court affirmed the lower court's conclusion that the CGL insurer owed no duty to defend. *Silk*, 192 W.Va. at 526, 453 S.E.2d at 360.

The contractual liability exclusion was also applied in a Pennsylvania case. *See Snyder Heating Co., Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 715 A.2d 483 (Pa. Super. Ct. 1998). In *Snyder*, a school district entered into contracts with a heating company for the company to maintain school boilers. The school district alleged that contrary to the requirements of the maintenance agreements, the company failed to seal and close the boilers, failed to properly test and inspect the boilers, failed to properly clean the boilers, etc., resulting in damage to school property. *Id.* at 487. As in the case *sub judice*, the contractual liability provision contained in the heating company's CGL policy provided, "[t]his insurance does not apply to . . . 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." *Id.* at 485. Because the claims in the school district's lawsuit "solely arose out of and [were] based on [the heating company's] failure to perform under the terms of the boiler/burner maintenance agreements[,]" the Pennsylvania court concluded that the contractual liability exclusion applied to bar coverage. *Id.* at 487.

Street contends that Bitco's contractual liability exclusion only applies to circumstances where the insured has contractually assumed the liability of a third party. In asserting this argument, Street relies upon an opinion of the Wisconsin Supreme Court:

> We conclude that the contractually-assumed liability exclusion applies where the insured has contractually assumed the liability of a third party, as in an indemnification or hold harmless agreement; it does not operate to exclude coverage for any and all liabilities to which the insured is exposed under the terms of the contracts it makes generally.

*American Family Mut. Ins. Co. v. American Girl, Inc.*, 673 N.W.2d 65, 81 (Wis. 2004). Although Tennessee courts have not addressed this issue, Street believes it likely that the Tennessee Supreme

16

Court would adopt the stance taken in *American Family Mutual* because the Tennessee Court cited *American Family Mutual*—albeit for a different proposition—in the *Travelers* opinion.[18]

Street's "third party" argument is belied, however, by the plain and unambiguous policy language. The first sentence of the exclusion makes no reference to "third parties" or to "assuming the liability of third parties." It merely says that there is no coverage for bodily injury or property damage "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." As the Texas Supreme Court has recognized, if a contractual liability exclusion "had . . . been intended to be so narrow as to apply *only* to an agreement in which the insured assumes liability of another party by an indemnity or hold-harmless agreement, it would have been simple to have said so." *Gilbert Texas Construction, L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d. 118, 127 (Tex. 2010). Moreover, if the entire contractual liability exclusion was only meant to apply to third party indemnity agreements, there would be no reason to have the second exception to the exclusion, which provides coverage for liability "[a]ssumed in a contract or agreement that is an 'insured contract'[.]" Pursuant to Street's theory, both the exclusion and the second exception to the exclusion would serve the same purpose, but "[a]n insurance policy should never be interpreted so as to create an absurd result[.]" *See* Syl. Pt. 2, in part, *D'Annunzio v. Security-Connecticut Life Ins. Co.*, 186 W.Va. 39, 410 S.E.3d 275 (1991).[19] Obviously, this Court cannot change Tennessee's law or adopt new policy for our sister state. Given the unambiguous language in the contractual liability exclusion, coupled with the strong pronouncement in *Travelers* and *Vernon Williams*[20] that CGL coverage is not for contractual liability, we reject Street's argument regarding application of Wisconsin's "third party" law.

Next, Street contends that even if the contractual liability exclusion comes into play, there would still be coverage because of the first exception to the exclusion: "This exclusion does not apply to liability for damages: (1) That the insured would have in the absence of the contract or agreement[.]" Street argues that "[t]he allegations leveled against J.A. Street support both tort and breach of contract claims." However, given the specific claims for breach of contract asserted in the underlying action, Street's argument is unavailing. While it is true that Street might have had some extra-contractual responsibility, the sole claims asserted against it in Thundering Herd's Amended Complaint are for breach of contract. No torts are alleged in this lawsuit, thus Street is not seeking a defense and coverage for tort claims. Indeed, the circuit court concluded that the statute of limitations for bringing a tort action had expired before Street was added as a defendant. As such, the first exception to the contractual liability exclusion is simply inapplicable to the instant litigation.

---

[18] In *Travelers*, the Tennessee Supreme Court cited Wisconsin's *American Family Mutual* for the fact that CGL policies have been used since 1940, and for the recognition that the analysis in *Vernon Williams* had been based upon policy exclusions rather than upon the insuring agreement. *See Travelers*, 216 N.W.3d at 305, 307.

[19] Street has never asserted coverage pursuant to the "insured contract" exception to the contractual liability exclusion.

[20] *See Travelers*, 216 S.W.3d at 307; *Vernon Williams*, 591 S.W.2d. at 763-64.

Turning briefly to Bitco's umbrella policies, this insurance covers certain losses in excess of the underlying Bitco CGL insurance. Moreover, the Bitco umbrella policies contain a contractual liability exclusion that is worded identically to the exclusion in the underlying CGL policies. Because the underlying CGL policies were not exhausted, and because of the contractual liability exclusion, we conclude that there is also no coverage under Bitco's umbrella policies.

For the reasons set forth herein, Bitco owes neither a duty to defend nor a duty to indemnify Street against the allegations in Thundering Herd's Amended Complaint. As such, the circuit court did not err in granting summary judgment to Bitco. Because the contractual liability exclusion applies to foreclose any coverage under Bitco's policies, the remaining exclusions and issues raised by the parties are moot.

## B. Ohio Casualty

Ohio Casualty issued an umbrella policy to Street for a single year of the Merritt Creek Farm project: March 1, 2001, to March 1, 2002. This policy was written as excess to a Bitco CGL policy that had limits of one million dollars per occurrence. On appeal, Street argues that the circuit court erroneously granted summary judgment to Ohio Casualty upon concluding that no covered "property damage" caused by an "occurrence" took place during Ohio Casualty's policy period, and upon concluding that Street failed to exhaust Bitco's underlying CGL coverage before turning to Ohio Casualty's umbrella policy. Ohio Casualty argues in support of these rulings. In addition, Ohio Casualty cross-appeals asserting that the circuit court should have also concluded that even if there was some covered "property damage" from the 2001 Target slope failure, Street still did not exhaust Bitco's underlying coverage. Ohio Casualty also urges application of its impaired property exclusion to bar coverage. After considering the parties' arguments, we agree that Ohio Casualty is entitled to summary judgment for the reasons specified in the circuit court's order.

Ohio Casualty's one-year coverage term ended before construction began on any of the buildings at Merritt Creek Farm. However, site preparation work for the planned Target store, the construction of the land "pad" upon which the Target store would later be built, and the September 2001 failure of a slope at the Target site, did take place during Ohio Casualty's policy period. The September 2001 slope failure damaged the pad and an adjacent property owned by a third party. Thundering Herd has reportedly incurred $721,874.18 in expenses as a result of this slope failure. This amount includes $78,619.30 paid for the damage to the neighbor's property. The remainder was spent on various invoices incurred in studying the problem and repairing the Merritt Creek Farm site, including repairing the Target slope and pad.

The Ohio Casualty umbrella policy covers losses in excess of the applicable limits of the underlying CGL policy due to "property damage" caused by an "occurrence[.]" The policy defines "property damage" as "physical injury to tangible property, including all resulting loss of use of the property. All such loss of use will be deemed to occur at the time of the physical injury that caused it." The policy defines an "occurrence" as an "accident." As we discussed above, under Tennessee law, faulty workmanship is not covered by a standard CGL policy.[21] It is only when

---

[21] *See supra*, section III.A. of this opinion.

unexpected damage to person or property *results* from faulty workmanship, that CGL coverage may be implicated.

In this particular matter, the site preparation—including installation of fill material, grading of the land, construction of slopes, and construction of the pad—are the instances of alleged faulty workmanship. There were no structures yet on the site. During Ohio Casualty's policy period, the only possible damage resulting from the alleged faulty work would be the damage to the neighbor's property. As the circuit court correctly recognized, the $78,619.30 spent to purchase or repair the neighbor's property would not exhaust the limit of Bitco's underlying CGL policy. Ohio Casualty's policy only covers certain damages that are in excess of the limits of the underlying policy:

G. RETAINED LIMIT

We will be liable only for that portion of damage, subject to the Each Occurrence Limit stated in the Declarations, in excess of the "retained limit," which is the greater of:

1. the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other insurance providing coverage to the "Insured" during the Policy Period[.]

Furthermore, even if we were to assume *arguendo* that reconstruction of the pad and slope and all other expenses were incurred as the *result* of faulty workmanship, and we were to assume that those expenses were covered by Bitco's CGL policy, the $721,874.18 incurred is still less than Bitco's one-million-dollar per occurrence limit. Accordingly, it clear that Ohio Casualty was entitled to summary judgment. In light of this ruling, it is unnecessary for us to address any remaining issues raised with regard to Ohio Casualty's policy.

**C. Zurich**

Zurich issued an excess and umbrella policy to Street for the single policy period March 1, 2002, to March 1, 2003. The circuit court granted summary judgment in favor of Zurich based upon application of contractual liability exclusions and the impaired property "exclusion M." The circuit court also found that certain economic damages that Thundering Herd seeks to recover in the lawsuit do not constitute covered "property damage." On appeal, Street argues that those rulings were in error. Zurich argues in support of the circuit court's summary judgment order, and also files a cross appeal arguing that the circuit court should have granted summary judgment on additional grounds including a subsidence exclusion, the loss in progress doctrine, the failure to provide timely notice of a claim or occurrence, the performing operations exclusion, and a lack of covered "property damage." After considering these issues, we conclude that the contractual liability exclusion is applicable and entirely dispositive of Zurich's obligations in this matter.

19

The Zurich policy provides two categories of coverage: Coverage A and Coverage B. Coverage A is "Excess Follow Form Liability Insurance" which incorporates the terms of the underlying Bitco CGL policy and only applies to damages in excess of the total applicable limits of the underlying insurance. Inasmuch as we have already concluded that the contractual liability exclusion in Bitco's CGL policy operates to deny coverage for the allegations against Street in Thundering Herd's Amended Complaint, then, consequently, there can be no coverage under Zurich's Coverage A.

Zurich's Coverage B is "Umbrella Liability Insurance" that can sometimes apply when coverage is not afforded by the underlying CGL insurance. However, Coverage B contains its own contractual liability exclusion:

B. Under Coverage B only, this policy does not apply to:

1. Bodily injury or property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

(Bold emphasis omitted.) This language is identical to Bitco's contractual liability exclusion, except the Zurich policy does not set forth any exceptions to the exclusion. Our reasoning regarding Bitco's contractual liability exclusion is equally applicable here. Because all of Thundering Herd's allegations in the Amended Complaint assert liability arising solely from the parties' contracts, the contractual liability exclusion in Zurich's Coverage B precludes coverage.

Accordingly, we conclude that the circuit court did not err in granting summary judgment to Zurich. It is unnecessary for us to address the remaining arguments and exclusions that are asserted with respect to Zurich's policy.[22]

### D. Scottsdale

Scottsdale provided a third layer of excess coverage to Street during two policy periods: March 31, 2003, to March 1, 2004; and March 1, 2004, to March 1, 2005. The Scottsdale policies were excess to Bitco umbrella policies, which were in turn excess to Bitco CGL policies. Critically, the Scottsdale policies are follow form policies that expressly incorporate the provisions of the underlying Bitco policies: "This policy is excess insurance and, except as otherwise stated in this policy, follows the terms, conditions, exclusions, definitions and endorsements of the 'Underlying Insurance' described in ITEM 5 of the Declaration." The circuit court concluded that since there is no coverage under the underlying Bitco policies, by operation of the follow form provision, there is no coverage under the Scottsdale policy. We agree. Because Bitco owes neither a duty to defend nor a duty to indemnify Street against Thundering Herd's Amended Complaint, neither does Scottsdale. The circuit court did not err in granting summary judgment to Scottsdale. Although the parties also raise issues with regard to the notice that Scottsdale received about the

---

[22] Although we decline to address the issue, we observe that both Zurich and Scottsdale make persuasive arguments on cross appeal regarding the application of their respective subsidence exclusions. This Court is aware that subsidence exclusions are standard in most CGL policies. For reasons not specified in their briefs, the remaining respondents have not raised any subsidence exclusions on appeal.

risk and about Thundering Herd's claim(s), as well as other exclusions in Bitco's and Scottsdale's policies, it is unnecessary for us to resolve those issues, and we decline to do so.

## E. Princeton

Princeton provided Street with excess insurance coverage for a single policy year: March 1, 2005, to March 1, 2006. Princeton's policy was excess to a Bitco umbrella policy, which was in turn excess to a Bitco CGL policy. Under its insuring agreement, Princeton's policy provides coverage for "sums in excess of the amount payable under the terms of any Underlying Insurance[.]" Moreover, the policy is a follow form policy, specifying that

> [t]his insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the Underlying Insurance except as otherwise provided in this policy; provided, however, that in no event will this insurance apply unless the Underlying Insurance applies or would apply but for the exhaustion of its applicable Limit of Liability.

The circuit court concluded that because there is no coverage under the underlying Bitco policies, by operation of the excess and follow form provisions in the Princeton policy, there is no coverage under the Princeton policy, either. We agree. Because Bitco owes neither a duty to defend nor a duty to indemnify Street against Thundering Herd's Amended Complaint, neither does Princeton. Accordingly, we affirm the circuit court's award of summary judgment to Princeton.

## F. Cincinnati

Cincinnati provided both CGL and commercial umbrella liability coverage to Street for three policy periods: March 1, 2007, to March 1, 2009; March 1, 2009, to March 1, 2012; and March 1, 2012, to March 1, 2015. The circuit court granted summary judgment to Cincinnati on the basis of contractual liability exclusions included in the CGL and umbrella policies. Street appeals this decision, asserting the same arguments that it did with respect to Bitco's policies. Cincinnati argues in support of the circuit court's ruling on the applicability of the contractual liability exclusion. In addition, Cincinnati raises cross-assignments of error asserting that the circuit court should have also concluded that there was no covered "property damage" under the policies; that if there was "property damage" it occurred prior to Cincinnati's coverage period; and that Street failed to provide Cincinnati with timely notice of Thundering Herd's Amended Complaint. After considering the parties' arguments, we agree that Cincinnati is entitled to summary judgment.

Cincinnati's CGL policies include the following contractual liability exclusion:

This insurance does not apply to
. . .

21

b. Contractual liability
"Bodily injury" or "property damage" for which the insured is obligated to pay damages *by reason of the assumption of liability in a contract or agreement*. This exclusion does not apply to liability for damages:

> (1) That the insured would have in the absence of the contract or agreement; or
> (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. When a claim for such "bodily injury" or "property damage" is made, we will defend that claim provided the insured has assumed the obligation to defend such claim in the "insured contract". Such defense payments will not reduce the limits of insurance.

(Emphasis added.) Although worded slightly differently, the contractual liability exclusion in Cincinnati's Umbrella policies contains the same operative language:

> This insurance does not apply to:
> . . .
> 3. Contractual Liability
> Any liability for which the insured is obligated to pay damages *by reason of the assumption of liability in a contract or agreement.* This exclusion does not apply to liability for "bodily injury", "personal and advertising injury" or "property damages":
>
> > a. That the insured would have in the absence of the contract or agreement; or
> > b. Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury", "personal and advertising injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

(Emphasis added.) As we concluded with respect to Bitco's policies, a straight-forward reading of the Amended Complaint reveals that Thundering Herd is only seeking to have Street pay damages by reason of Street's alleged assumption of liability in their construction contracts.[23] Accordingly, Cincinnati's contractual liability provisions operate to exclude coverage for Thundering Herd's claims against Street in the Amended Complaint. Cincinnati owes neither a duty to defend nor a duty to indemnify Street from the Amended Complaint, and summary judgment was correctly granted to Cincinnati. In light of this ruling, the parties' remaining arguments regarding Cincinnati's policies are moot.

## IV. Conclusion

For the foregoing reasons, the circuit court's six summary judgment orders entered on December 30, 2016, are affirmed.

---

[23] *See supra*, section III.A.ii. of this opinion.

22

Affirmed.

**ISSUED:  May 1, 2019**

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison